# GETTYSBURG NATIONAL BANK *vs.* EZRA C. BROWN.

*Liability of Subscriber to Stock of Corporation When Whole Amount has Not Been Taken—Formative Stock—Increased Stock—Acquiescence by Subscriber in Conduct of Business by Corporation With Partially Subscribed Stock.*

When one subscribes to the original or formative stock of a corporation there is an implied condition that the entire amount of the capital stock fixed by the charter will be taken, and such subscriber is not liable upon his subscription unless all the stock is subscribed for, or unless he waives that implied condition by some act, such as participating in the operation of the company with knowledge that all the stock has not been taken, which will show that he acquiesced in the company's doing business with only partially subscribed stock.

But the subscriber to an issue of increased stock is liable upon his subscription although all of the authorized issue is not taken, unless there be an express condition to that effect.

When before a corporation begins to do business its charter is amended changing the capital stock in the amount and value of the shares and annulling the former stock, such new stock is original or formative.

The certificate of incorporation of a company, filed December 5th, 1899, provided for a capital stock of $1,000 divided into shares of five dollars each. A few days afterwards and at a time when only eleven shares had been subscribed for, a meeting was held at which it was resolved to make the capital stock $250,000, divided into shares of the par value of one dollar each. The certificate of this amendment of the charter was filed for record on March 2nd, 1900. The defendant subscribed for 300 shares of stock at a meeting held in January, 1900, when he was informed that the capital stock was $250,000 and the par value of each share one dollar. The company had not then begun to do business. Defendant attended no subsequent meetings. The capital stock was never fully subscribed for and the defendant had paid only a part of his subscription when the corporation became insolvent. This action was brought by a creditor of the corporation to enforce defendant's liability under Code Art. 23, sec. 64, which provides that stockholders shall be liable to the creditors of the corporation for its debts to the amount of their unpaid subscription to the capital stock. *Held*,

1st. That the amendment of the company's charter did not operate to increase the number of shares of stock but, obliterating the old, substituted a new capital stock different in the amount, number and par value of the shares, and that this new stock was original or formative.

2nd. That the fact that the charter was not actually amended by certificate filed until after defendant's subscription makes no difference in this regard, because under the original charter the company had no power to issue such stock as that for which he subscribed and his subscription was conditional upon the amendment of the charter.

3rd. That since the entire amount of the amended capital stock was not taken, the defendant is not liable upon his subscription, there being no evidence to show that he participated in the conduct of business by the corporation, as a stockholder, knowing that its stock was only partially subscribed.

Appeal from the Circuit Court of Carroll County (JONES, C. J.)

*Plaintiff's 1st Prayer.* That by the uncontradicted evidence in this case, the United Milk Producers' Association of Baltimore City was a corporation of such a nature that it could not be fairly presumed by any stockholder that it would not begin business until all the authorized increase in capital stock had been subscribed for and that therefore, the defense attempted to be interposed by the defendant bearing upon the alleged non-subscription for the full amount of said authorized in-

crease in capital stock, is no defense to the plaintiff's suit in this case. (*Rejected.*)

*Plaintiff's 2nd Prayer.* The plaintiff prays the Court to instruct the jury that if they find that the United Milk Producers' Association of Baltimore City is indebted to the plaintiff on the note in evidence in this case and that at the time the said indebtedness was incurred the defendant was a stockholder in said corporation to the extent of four hundred shares of the par value of one dollar per share and that the said defendant has only paid on account of said subscription the sum of one hundred and forty-two dollars and fifty cents ($142.50); then the verdict of the jury must be for the plaintiff in the sum of two hundred and fifty-seven dollars and fifty cents. (*Rejected.*)

*Plaintiff's 3rd Prayer.* The Court at the request of the plaintiff, instructs the jury that if they find:

1. That the United Milk Producers' Association of Baltimore City was originally incorporated under the laws of the State of Maryland on or about the 6th day of December, 1899, with an authorized capital stock of $1,000 divided into 200 shares of the par value of $5.00 per share and that the said company shortly after its incorporation during January, 1900, before the full amount of its original stock was subscribed organized by the election of officers opened an office in Baltimore City, regularly transacted business and incurred indebtedness.

2. That on or about the 2nd of March, 1900, said corporation, by an amendment of its charter, duly adopted and recorded authorized an increase of its capital stock to the amount of $250,000 and reduced the par value thereof to $1.00 per share.

3. That the defendant before the discount by the plaintiff of the note offered in evidence, hereinafter mentioned, subscribed for four hundred shares of the increased capital stock of the said United Milk Producers' Association of the par value of one dollar per share, and that the defendant though still a stockholder therein has only paid on account of said subscription the sum of $142.50.

4. That on or about the 22nd day of August, 1900, the plaintiff, in due course of business, discounted the note for $2,900 drawn by the said United Milk Producers' Association, and that the said note was not paid at its maturity by the said association, and that the association is now insolvent and nothing has been paid on account of said note to the plaintiff.

Then their verdict must be for the plaintiff for the amount of defendant's subscription remaining unpaid.    (*Rejected.*)

*Plaintiff's 4th Prayer.* If the jury find that the United Milk Producers' Association of Baltimore City was incorporated under the General Laws of the State of Maryland, and the capital stock of said association as fixed in its amended certificate of incorporation was not fully subscribed for but also find that the said company was indebted to the plaintiff as stated in the declaration and that such indebtedness occurred by the discounting by the plaintiff of the note given in evidence in this case and also find that at the time the defendant was a stockholder in the said company to the extent of 400 shares of the par value of $1.00 per share, and that the defendant has only paid on account of his subscription to said capital stock the sum of $142.50 and further find that whilst he was such stockholder the defendant with knowledge of the fact that the capital stock of the company had not been fully taken and subscribed for, and that the company was engaging in business, purchasing property and incurring liabilities, continued for eight months to ship milk to the said company by virtue of his right as a stockholder, and to make monthly payments on account of his said subscription to its capital stock, then such action on his part is a waiver of any defense growing out of the fact that the capital stock of the company had not been fully subscribed for and the verdict of the jury must be for the plaintiff to the extent of defendant's subscription still remaining unpaid.    (*Rejected.*)

*Plaintiff's 5th Prayer.* That the defendant by signing the stock subscription contract in evidence in this case has waived all defense growing out of the non-full subscription of the increased capital stock of the United Milk Producers' Association of Baltimore City.    (*Rejected.*)

*Plaintiff's 6th Prayer.* That if the jury find from consideration of the charters, stock subscription contract, the general purposes of the United Milk Producers' Association as testified by the witness Crowther and the defendant, that the said corporation was of such a character that no stockholder could presume that it was not to commence business until the whole amount of its increased capital stock was subscribed for, then the non-full subscription of the capital stock of said corporation is no defense to this suit.   (*Rejected.*) ·

*Defendant's 1st Prayer.*—That if the jury shall find from all the evidence that the capital stock of the United Milk Producers' Association of Baltimore City was fixed and limited to $250,000 as testified to in evidence ; and shall further find that the defendant subscribed for four hundred shares of said capital stock at the times mentioned in evidence ; and shall further find from all the evidence that the said capital stock of said corporation was never subscribed in full and that not more than $187,000 of said capital stock was ever subscribed for, then the verdict of the jury must be for the defendant, unless the jury shall further find from all the evidence that the defendant knew that the whole of said capital stock had not been subscribed for and that after such knowledge the defendant participated in the affairs of the said United Milk Producers' Association of Baltimore City in a way which could only be properly done upon the assumption that the subscribers to said capital stock intended that the said United Milk Producers' Association of Baltimore City should proceed with its business if the jury so find, with the stock of said United Milk Producers' Association only partially subscribed.   (*Rejected.*)

*Defendant's 2nd Prayer.*—That if the jury shall find from all the evidence that the capital stock of the United Milk Produers' Association of Baltimore City was fixed and limited to $250,000 as testified to in evidence ; and shall further find that the defendant subscribed for four hundred shares of said capital stock at the times mentioned in evidence ; and shall further find from all the evidence that the said capital stock of said corporation was never subscribed for in full and that not

more than $187,000 of said capital stock was ever subscribed for, then the verdict of the jury must be for the defendant, although the jury may further find from all the evidence that at the times the said defendant subscribed for said capital stock he knew the whole of said capital stock had not been subscribed for and although the jury may further find that the said defendant after his said subscriptions to said capital stock shipped his milk to said United Milk Producers' Association of Baltimore City and was credited by said association every month during said shipment of milk to it with 5 per cent of the total amount of milk shipped as part payment of said capital stock subscribed for by him and that defendant knew said credits were being made as aforesaid, on his subscriptions to said capital stock, if the jury so find, unless the jury shall further find from all the evidence that the defendant as subscriber to the capital stock of the said United Milk Producer's Association of Baltimore City, intended that it should proceed with its business with the stock of said United Milk Producers' Association only partially subscribed. (*Granted.*)

*Defendant's 3rd Prayer.*—That the plaintiff has offered no evidence legally sufficient of an indebtedness from the Milk Producers' Association to the plaintiff and the verdict of the jury must be for the defendant. (*Rejected.*)

The cause was argued before McSHERRY, C. J., PAGE, BOYD, PEARCE, and SCHMUCKER JJ.

*W. Calvin Chestnut* and *Charles T. Reifsnider, Jr.*, (with whom were *Gans & Haman, E. Oliver Grimes, Jr.*, and *Stuart S. Janney* on the brief), for the appellant.

1. The attempted defense of non-full subscription has no application to this suit. (*a*) Because the stock subscribed to is increased stock. (*b*) Because the United Milk Producers' Association was a corporation of such a character that no stockholder could presume it would not start business until all of its capital stock was subscribed. (*c*) Because of the contract of subscription and the time and circumstances of the appellee's signing the same.

(*a*) The stock subscribed to is increased stock.  The authorities to the effect that the defense has no application to increased stock, as distinguished from original or formative stock, seem to be practically unanimous.  "A subscriber for increased stock cannot defeat an action to enforce his subscription by setting up the failure of the corporation to obtain subscriptions for the whole of the authorized increase." *Cook on Corporations*, sec. 288.  To the same effect are *Clark and Marshall, Corp.*, vol. 2, sec. 505; *Thompson Commentaries*, secs. 2102–3; also sec. 3694; *Morawetz, Corp.*, vol. 1, sec. 142; *Clarke* v. *Thomas*, 34 Ohio St. 40.  In this case a mining company, two months after its incorporation, purchased a mine for the full amount of its capital stock.  At the time of the purchase it was contemplating an increase in its capital stock, which was effected four days later.  The defendant, who was not an original subscriber, took some of the new stock, but did not pay for it.  It was held that he was liable to the receivers upon the subsequent insolvency of the company, although the full amount of the increased stock was never subscribed.  In the same volume the Court recognizes the defense where the stock is original stock.  *Jewett* v. *Valley R. Co.*, 34 Ohio St. 601; *Miller* v. *Lexington R. R. Co.*, 6 Gray, 85.  Here the defense was denied for the same reason, the Court at the same time recognizing its efficacy in cases of original stock.  See further *Delano* v. *Butler*, 118 U. S. 634; *Avegno* v. *Celefrus Bank*, 40 La. Ann. 799; *Greenbrier Ind. Exp.* v. *Ocheltree*, 44 W. Va. 633.

The principle has been distinctly recognized by this Court. *Balto. City Passenger R'y Co.* v. *Hambleton*, 77 Md. 348.  In *Read* v. *M. & G. Co.*, 9 Heisk. 545, referred to by some writers as an authority for the opposite contention, the question was not involved, the Court there deciding that the defense was not applicable because all of the authorized capital stock was subscribed.  The case is also in other respects different.

The reason of the distinction is plain.  When one subscribes to original or formative stock before the organization or in-

corporation of the company, he becomes by virtue of his sub-scription a stockholder, on an equal footing with all others connected with the enterprise. Each of these is presumed to have estimated that the amount of capital fixed in the articles or charter is necessary for the successful conduct of the business to be undertaken. In such cases the law frequently implies a condition in the contract of subscription that *without the subscriber's assent* the corporation will not *organize* until the full amount of stock is taken. *Morrison* v. *Dorsey,* 48 Md. 473; *Hager* v. *Cleveland,* 36 Md. 476. When one, as in the present case, subscribes to a proposed issue of increased stock of an already existing corporation he is on a different footing. His subscription is a mere contract with the corporation. *Balto. City Passenger R'y Co.* v. *Hambleton,* 77 Md. 347. The corporation being at the time of his subscription an organized legal entity, the condition cannot be read into his subscription that it will not organize until the whole increased issue is taken.

In the present case the United Milk Producer's Association sold, and the appellee agreed to purchase, a definite number of shares of increased stock. The appellee did not, of course, become a stockholder by signing the subscription contract; he merely assumed a contractual relationship with the association, and had no right to take the slightest part in its affairs as stockholder until the amendment had been recorded and the stock paid for as demanded. *Code,* Art. 23, sec. 47; *Balto. C. P. R'y Co.* v. *Hambleton,* 77 Md. 347. The corporation, after doing business for about two months, amended its charter, providing for increased stock, and assigned to the appellee his quota, which was accepted by him. The contract was then executed and the appellee became for the first time a stockholder of the corporation. He had purchased from an existing corporation a new issue of capital stock. The reasons which admit the defense in favor of subscribers to original stock before the organization of the company have no application to such a case.

The fact that the original issue was never fully subscribed

can make no difference. The appellee is not a subscriber to the original issue. A corporation becomes an existing entity when its charter is filed for record. *Code*, Art. 23, sec. 45. It may then validly organize, do business and make binding contracts without having its stock fully subscribed. *Hager* v. *Cleveland*, 36 Md. 490.

(*b*) The United Milk Producers' Association was a corporation of such a character that no stockholder could presume it would not start business until all of its capital stock was subscribed. An inspection of the subscription contract shows clearly that none but milk producers could be stockholders of the company, and the number of shares held by each man was to bear a fixed ratio (ten to one) to the number of gallons of milk he shipped each day. By the special act amending the charter the company was authorized to limit its stockholders to milk producers and to redeem at par all stock coming into the possession of those not entitled to hold it.

It thus appears that the corporation might redeem at any time its stock from any holder whose milk production decreased or ceased altogether, and by such action decrease the amount of its capital stock outstanding. It cannot, therefore, be contended that the full subscription of the capital stock was necessary for the conduct of the company's business, and under such circumstances the defense has no application. *Musgrave* v. *Morrison*, 54 Md. 164; *Arkadelphia Mills* v. *Trimble*, 54 Ark. 316; *Clark and Marshall, Corp.*, sec. 505.

(*c*) The contract of subscription and the time and circumstances of the appellee's signing the same. At the time the appellee subscribed for the first 300 hundred shares of increased stock there existed nothing of record showing the amount of the proposed increase, and no article or agreements to which he was a party was in existence. Under these cirsumstances we find that in the early part of January, 1900, the appellee signed the unconditional subscription contract given in evidence.

He did not become a stockholder by virtue of this subscription to increased stock and thus have the assurance that

no change could be made without his having an opportunity to be heard and an opportunity to vote for or against it ; he simply made a contract with the corporation. *Balto. C. Pass. Co.* v. *Hambleton*, 77 Md. 347. By the terms of the contract he vested in the corporation—that is, the *the original stockholders*—"full authority to change, by amendment or otherwise, the authorized capital stock of said corporation:" The amount of the issue was not noted in the contract. It imposed no limitation on the amount to be subscribed before he should be bound. It is perfectly clear, therefore, that had the original stockholders subsequently elected to increase the stock to the exact amount subscribed-he would have been forced to take the shares he had subscribed for. This they might have done, for simply authorizing the issue is not in any way irrevocable. *Terry* v. *Eagle Stock Co.*, 47 Conn. 141–163.

The practical effect of the appellee's action was to subscribe to 100 shares of the increased stock, irrespective of the amount to be issued or subscribed. In view of these facts he cannot be heard to say that he intended to make the subscription of $250,000 of increased stock a condition precedent to the corporation embarking in its businesss. By his contract he was bound if half the amount was issued. The defense is only applicable when the amount of the capital is fixed by the charter, with reference to which the subscription is supposed to be made, or in the articles of association or in the contract itself, and is not available where the amount is left to the discretion of the corporation. *Kennebec and Portland R. R. Co.* v. *Jarvis* 34 Me. 360. To the same effect is *Warwick R. R. Co.* v. *Cody*, 11 R. I. 131. See also *Hambleton Co.* v. *Rice*, 7 Barb. S. C. 157–166; *S. & A. R. R. Co.* v. *Kineman*, 77 Me. 370; *Lynch* v. *E. L. & M. R. Co.*, 57 Wis. 432; *Compress Co.* v. *Saunders*; 70 Tex. 700.

The contract of subscription being in writing, no parol evidence of any understanding as to the amount of the issue would be admissible, and, indeed, none was offered. *Scarlett* v. *Academy of Music*, 46 Md. 149; *Hickling* v. *Wilson*, 104 Ill. 54. The remaining 100 shares of stock were subscribed at

the office of the company in Baltimore City, where the company had been conducting active operations for some months and where the appellee had all that time been shipping milk. By this subscription he is shown to have known the full amount of stock had not been subscribed and to have placed no dependence on the fact. *Musgrave* v. *Morrison*, 54 Md. 164.

2. Error in granting the appellee's second prayer. Even should the Court determine that the defense of partial subscription is available to the defendant in this case, still there was error in granting the appellee's second prayer. The prayer directs a verdict for the defendant even though the jury should find that at the time of the defendant's subscriptions he knew the whole of the capital stock had not been subscribed for and that he continued to ship milk to the association and to receive credits therefor on his stock, except on the one contingency that the defendant, as subscriber, intended that the association should proceed with its business with the stock only partially subscribed. The defendant's second subscription was made some time in the spring, after he had been shipping milk to the association for some months, and the company, to his knowledge, had been actively doing business for the same time. If at that time he knew, as stated in the prayer, that the full amount of capital stock had not been subscribed, his subscription was a waiver of the fact irrespective of any intention the jury might give him credit for. *Musgrave* v. *Morrison*, 54 Md. 164; *Clarke and Marshall, Corp.*, sec. 505.

Furthermore, the intention of the subscriber that the association should proceed with its business with its stock only partially subscribed is made the sole ground of liability. All other ways of waiving the fact are expressly excluded. The prayer itself sets up a state of facts remarkably similar to those in *Morrison* v. *Dorsey*, 48 Md. 472, where the Court emphatically declined to allow the defense. In the following cases different methods of waiving the fact are discussed, none of which depend on the *fact* of intention. *Hager* v. *Cleveland*, 36 Md. 476; *Stellman* v. *Dougherty*, 44 Md. 380; *Morrison* v. *Dorsey*, 48 Md. 472.

*James A. C. Bond* and *Guy W. Steele* (with whom were
*Benj. F. Crouse, Francis Neal Parke* and *John M. Roberts* on.
the brief), for the appellee.

The testimony shows that the company opened an office on
January 1st, 1900, but did not begin business until January
15th, 1900; and that on September 14th, 1900, application
for a receiver was successfully made ; that the company bor-
rowed money for its purposes from the appellant on the note
sued on ; that the book produced was one of the original stock
subscription books of the corporation, containing after the
date, " December 31st, 1899," a subscription contract.   The
appellant then called the appellee, who proved that " he had
never seen or read in the book said subscription contract," but
that the two signatures in the book were his, and that the first
was written sometime in January, 1900, and the second some
months later.   It further appears that the appellee had not
paid for in full his stock, and had shipped milk to the corpo-
ration in pursuance of an understanding with it ; that the capi-
tal stock of $250,000 was only subscribed to the extent of
$178,000 or $187,000 ; and that the appellee *"did not attend,
any but one meeting of the stockholders, which was when he first
subscribed for stock,* and he then heard them state at the meet-
ing that the capital stock of the association was $250,000.

The appellee's second prayer was based on the defense that
the capital stock of the United Milk Producers' Association
was only partially subscribed, and submitted the question of
waiver *vel non* to the jury.   There can be no question that this
is a proper defense to suits *for a subscription to the capital stock
of a corporation when the amount and number of shares are fixed
in its charter.   It is res adjudicata in Maryland.   Hughes case,*
34 Md. 316, 332; *Fiery case,* 36 Md. 474; *Hager case,* 36
Md. 491; *Garling case,* 41 Md. 327 (See prayer) ; *Stillman* v.
*Dougherty,* 44 Md. 384.

Appellant's first prayer requests the Court to instruct the
jury that from the character of the United Milk Producers'
Association no stockholder could presume *that it would not
begin business before all its stock was fully subscribed.*   The de-

fense of *partial subscription* is not available in every case, for many corporations are authorized to begin business when only a part of its stock is taken.    In others, the amount is left entirely to the discretion of the board of directors.    It will not apply in such cases.    But it is a good defense whenever " *the capital stock and number of shares are fixed in the recorded certificate, unless it appear from the general law or recorded certificate* that it was authorized to begin business with only a partial subscription." *Hughes case*, 34 Md. 332; *Fiery case*, 36 Md. 474; *Garling case*, 41 Md. 323.

What is there in the charter of the company to cause a stockholder to presume that it would undertake these extensive operations with only a part of its capital?    On the contrary, it is self-evident that every dollar of it would be required to manufacture cheese, butter, ice cream, condensed milk, ice, and build a cold storage plant or plants and a warehouse or warehouses, and conduct it to successful termination.    Not one word in it raises the presumption requested by the appellant's prayer, and it was properly rejected.    There is no evidence in the record to warrant the granting of so bald a proposition ; or to justify the Court in putting this corporation into a class to which it did, and does not belong.    Its charter, history, its plans, purposes and objects, its business programmes, methods of trade and nature of business procedure, all designate the class of corporations to which it is to be assigned.

Appellant's third prayer is formally defective in leaving to the jury to find that the amendment of the charter was duly adopted and recorded—a matter of law—yet the prayer is designed to present the real question in this case : Was the appellee's subscription one made to the original and formative stock of the corporation ?    The inquiry is, therefore, what was the original or formative stock of the corporation ?    Was it the capital stock of $1,000 or the capital stock of $250,000. We reply that the change from a capital stock of $1,000 to a capital stock of $250,000 was not an increase of capital stock, but an *amendment of* the original charter by a substitution of a capital stock of $250,000 for the $1,000 first written.    And

for a vindication of this position we appeal (1) to the provisions of the Code ; (2) to the amended certificate itself ; and (3) to the evidence.

(1) *The Answer of the Code.* The change in the capital stock must be considered in the light of the law and of the facts, in order that its true significance may appear. , *On the 16th day of December, 1900,* the corporation was in its formative period, awaiting subscription to give it motion and life. The corporation at that time could not invoke the provisions of the Code *to increase its capital stock, as but eleven shares were taken of the two hundred, and as it had not even begun business.* The provisions of the Code authorizing the *increase or decrease of capital stock apply to a going concern.* This is made evident by the requirement that at the meeting called to consider the issuance of additional or increased capital stock *two-thirds of all the shares of stock must be represented and vote for a change,* (Art. 23, sec. 77, Code) ; and that the notice of the meeting must be inserted in a newspaper published in the city where the principal office of said corporation *is* located. (Sec. 76.) The object of the meeting is to prevent ill-advised action, and to consider the proposal for an increase in the light of the affairs and needs of the corporation whose stock must be fully two-thirds subscribed. And when an increase is determined upon, an original stockholder is entitled "to offer to subscribe for and demand from the corporation such a proportion of the new stock as the number of shares already owned by him bears to the whole amount of shares before the increase." (*Cook on Stock and Stockholders,* sec. 286.) It is evident, therefore, that the Code provisions apply to a going concern. It would be a manifest absurdity to contend that the provisions for the increase of capital stock *were applicable to* a corporation without an office or place of business and with but eleven shares of the total value of $55 subscribed for. If, then, this can not be an increase of capital stock under the provisions of the Code, what was or is it ? We answer that the change in the capital stock of the corporation was made in pursuance of the authority of every corporation to alter its charter by.

amendment. (*Code*, Art. 23, secs. 47, 42–4.) In other words, that after this amendment was made and recorded, the original and formative stock of the corporation was $250,000, divided into shares of the par value of $1 per share. "And after said alteration shall be recorded the same shall be taken to be a part of the said charter or instrument as if the same had been originally made a part thereof." *Code*, Art. 23, sec. 47. An examination of the amended certificate shows that *every step was taken to bring it within the law relating to amendments of charters.*

(2) *The Answer of the Amended Certificate.* The second or amended certificate complies with every requirement of the Code relating to amendments, and JUDGE HARLAN affirmed the certificate to be "in conformity with the provisions of law authorizing the amendment of charter of said corporation" which he could not have done had it been for an increase of stock. (Code, Art. 23, sec. 77.) An increase of stock presupposes an addition to the original stock, not an extinguishment of it. Here the original stock disappears. The amendment does not provide that the original stock of $1,000, divided into two hundred shares of the par value of $5 each, shall be increased to $250,000 by the issue of $249,000 more of capital stock of the par value of $1 per share, but it does provide that the capital stock shall be thenceforth $250,000, divided into two hundred and fifty thousand shares of the par value of $1 per share. The provision of the first certificate with respect to the capital stock of $1,000 is abandoned after the meeting on December 16th, 1899, and not a single share of it is subsequently taken. Can it now be said that the primary or formative stock of the corporation is a stock that was forever discarded just *eleven days* after the formation of the corporation and when not enough of it was subscribed for to give one share to each of the twelve directors, who were likewise its incorporators?

(3) *The Answer of the Evidence.* The appellee, Brown, was told when he subscribed in January, 1900, that the capital stock of the corporation was $250,000, and the original

stock. subscription book signed by the appellee, was headed with the date "December 31st, 1899," and called for a subscription to "the capital stock of the United Milk Producers' Association of Baltimore City at one dollar per share," all showing that before the corporation had ventured upon a single business transaction, the stock of $5 per share was forsaken for the capital stock of $250,000 at $1 per share. William B. Crowther, president of the short-lived company, testified that the association was organized in December, 1899, and that this was merely a *nominal organization* is shown by his further statement that the corporation did not begin business until January 15th, 1900, and did not even open an office until January 1st, 1900. Crowther further stated that there was never but the eleven shares of stock taken of the $1,000 capital, and that at the meeting in December, 1899, these eleven shares authorized the change to $250,000 ; and that "*The company began to do business ( January 15th, 1900), not before the capital stock ($250,000) was authorized, (December meeting, 1899) but before there was any action on the part of the Court in granting the charter to increase our capital stock to $250,000 (March 2nd, 1900.)*

An examination of the authorities cited by the plaintiff below, in support of the prayer, shows all the cases upon which the text is based to have been one where the subscriber knew that he was taking other than the original stock, and where the stock was issued by corporations when they were in full exercise of their chartered powers and their corporate business. It is important to remember in this connection, that the recording of a certificate does not create an active corporation. Shareholders must be first obtained. *Morawetz, Priv. Corp.*, sec. 33.

*The Appellant's Fourth Prayer.*—Recognizing the defense of the appellee, assumes facts, which it is claimed amount to an implied waiver. There is no evidence in the record which shows that the appellee knew that its stock was only partially subscribed and that it was incurring liablities, and after such knowledge continued to ship milk to it for eight months by

virtue of his rights as a stockholder. 73 Md. 533. They are assumed for the purposes of this case. Even if it were true, they would not amount to a waiver. Simply selling his milk to it and making partial payments on account of his subscription to its stock cannot prevent him setting up this defense, for there must be *acts of participation in the affairs of the company.* "The mere fact that he paid his subscription, knowing the whole capital had not been paid in, and that the company was incurring debts for property and materials *were not such acts of participation* as to estop him from setting up as a defense in this action the partial subscription of the capital stock." *Garling case,* 41 Md. 305, 326. If then the payment of the full subscription, knowing that the company is doing business and incurring liabilities with its stock only partially subscribed, is not a waiver, how can a part payment be? Selling milk to the company cannot amount to an estoppel for there must be "some act or acts or participation upon his part, *upon the faith of which debts were contracted,* to estop him from setting up such a defense." *Garling case, supra* The appellee never participated in the affairs of the company, attended none of its meetings (except before it began business, when he subscribed for stock)—his whole connection with it from first to last being his subscription to the stock and the sale of his milk. *There is not a particle of evidence to show that the appellee knew anything about the business the company is said to have been doing.*

PAGE, J., delivered the opinion of the Court.

This suit was brought by a creditor of the United Milk Producers' Association, an insolvent corporation, against the appellee, one of its stockholders, to enforce the liability imposed by the 64th section of Article 23 of the Code of Public General Laws. The association was incorporated, as appears from the certificate, on the 5th day of December, 1899. The purposes of its creation were for dealing in milk and cream and the manufacture of the same into butter, cheese, ice-cream, condensed milk, and other by-products, for buying,

selling, and exchanging eggs, poultry and other farm products, and the more effectually to carry into execution these objects, for buying, selling, leasing and mortgaging property of all kinds, real and personal, and for improving the same by erecting warehouses and cold-storage plants, and for manufacturing and selling ice and doing all things that may be lawfully done in connection with said main business. Its capital stock was $1,000, divided into two hundred shares of the par value of five dollars each. After eleven shares of the stock had been subscribed and paid for, a meeting of the stockholders, eleven in number, each holding one share, was held on the 16th December, 1899, and it was at that time resolved, "that the par value of the shares .* * be and the same is hereby reduced from five dollars per share to one dollar per share, and that the capital stock, * * * be and the same is hereby increased from $1,000 to $250,000, divided into 250,000 shares of the par value of one dollar each." This resolution, attested by the president, was incorporated in a certificate, which is referred to by the stockholders as "a certificate of the amendment of its charter by providing for a *change* of the par value and number of shares of its stock." It was filed for record on 2nd March, 1900. The company was organized, "first in December," the precise time does not appear. The president testified it ."started to do business on 15th January"—"not before the capital stock was authorized, but before there was any action on the part of the Courts in granting the charter to increase our capital stock." It was after the passage of the resolution authorizing a change in the par value and number of shares, and before the certificate was filed for record, that the appellee made his subscription for 300 shares of his stock; the remainder of his holdings, one hundred shares, was taken subsequently. The first subscription was made sometime in January, before the company had commenced to do business, at a meeting of the stockholders, who then stated that the capital stock was $250,000. He attended no other meeting; but received monthly statements showing his credits of five *per centum* per month on his sub-

scription, on account of the milk shipped by him. His second subscription for 100 shares was made about four months after the first. He testified it was not made "at any meeting," but "just at the place where they doing business" and that he then subscribed because "we were to give them so much they said of the amount of milk we were shipping and I thought it was not honest unless I paid them five per cent of the 400 gallons."

The law applicable to the liability under our statute of stockholders of insolvent corporations on account of unpaid subscriptions to the stock of the company has been stated by this Court in a number of cases. In *Hager* v. *Cleveland and Basset*, 36 Md. 490, it was said, " As a general rule where the capital stock and number of shares are fixed in the recorded certificate, no valid assessments or calls can be made on subscribers, until the whole capital stock is taken, unless there be a provision to that effect in the recorded certificate or general law, under which the company is incorporated." " It is a condition, however, which the subscriber may waive," either expressly or impliedly. " If knowing that the whole capital stock has not been subscribed, they attend the meetings of the company, co-operate in the votes for the expenditure ot money, for the purchase of property, for the making of contracts, and other acts which only could be properly done upon the assumption that the subscribers intended to proceed with the stock partially taken up, they would be estopped from setting up such a defense." *Hughes* v. *Antietam Man. Co.*, 34 Md. 332.

But as was said in *Garling* v. *Baechtel*, 41 Md. 325, the " mere fact that he paid part of his subscription knowing that the whole capital stock had not been paid in, and that the company was incurring debts for property and materials, are not such acts of participation as to estop him from setting up as a defense in this action the partial subscription of the capital stock."

These rules apply to subscriptions made before and after the company is chartered. *Morrison, &c.,* v. *Dorsey,* 38 Md.

472. ˙They are founded˙ upon˙ the theory that the subscription is˙made upon˙the implied understanding that the entire amount of stock fixed by the˙ charter is necessary for the successful prosecution of the business for which the company was incorporated.˙ ˙It is not to be˙ supposed that a reasonably prudent person will invest in˙ a corporation which is not to be supplied with sufficient ˙capital with which to prosecute its affairs ; and therefore it is that a presumption arises that the amount fixed in˙ the charter ˙shall˙ be ˙raised before the corporation creates any liabilities.    There is nothing, however, to be found in the laws of ˙this ˙State that operates to prevent a corporation˙ from organizing and electing officers˙before the whole amount fixed by the charter has been subscribed˙ and paid in; and if after organization new˙ subscriptions ˙are taken, the liability of the stockholders under sec. ˙64 of Article 23 is not thereby defeated. ˙ It is not the acquiescence of the stockholder in the organization of˙the company that *per se* will estop him from setting up as a defense to the claim of a creditor of the corporation the fact of the partial subscription of its stock ; but such acts of participation on his part in the conduct of its business as will indicate that he has consented to, and acqui-‚esced in, the company's proceeding in its business before the whole˙ amount of its capital stock has been subscribed.

˙These principles are well settled in this State and elsewhere, but because of the reasons on which they rest they can apply only to such stock as is necessary for the full organization of the company.    Between such stock as may be authorized and required by the charter, that is "original" or "formative" stock and "increased stock" there are substantial differences. *Balto. City Pass. Ry. Co.* v. *Hambleton*, 77 Md. 346.

In case of the issue of increased stock, there are no implied˙ understandings, that the whole of the authorized issue shall˙ be subscribed for.  1 *Cook on Stock and Stockholders*, sec. 288 and authorities cited, 3rd ed.         ˙ ˙

The subscribers' contract for such stock is that he will pay the price agreed upon for the stock, and if it is not delivered in accordance with such contract, he˙ is liable at any time to

be called upon to pay whatever balance he may owe. *Bank* v. *Eaton*, 141 U. S. 227; *Delano* v. *Butler*, 118 U. S. 634.

In the last mentioned case, as well as in *Aspinwall* v. *Butler*, 133 U. S. 610, after the company had been fully organized, a resolution was passed to increase the stock in a regular manner by the board of directors who had authority for that purpose. A part of the stock finally remained unsubscribed for. In the last mentioned case Aspinwall was sued to recover from him his subscription. He contended that inasmuch as the whole amount authorized was not subscribed for he could withdraw his subscription. The Court held that there was no express condition that the individual subscription should be void if the whole amount was not subscribed, and "no implied condition in law to that effect."

At the time when the appellee in this case subscribed, the eleven stockholders had determined by resolution passed at a regular meeting, substantially, that instead of undertaking to do business with a capital stock of $1,000, at $5 per share, they would surrender the provisions of their charter that authorized that number and amount of shares' and in lieu thereof by the means of an amendment or change in the original charter, organize another corporation which should have a capital stock of 250,000 shares at $1 per share. This change when effected did not therefore operate to increase the number of shares the company then had, but it obliterated the old stock, and in lieu thereof substituted another, differing in amount, number and par value. The company at the time of and before the adoption of this resolution had done no business and did not propose to do so. The subscription made by the appellee was to the stock of a company that he was assured would have a capital of $250,000 divided into as many shares, each of the par value of one dollar. If the concern in which he was to become a stockholder did not have such a capital, then he was made the victim of a fraud. The resolution had been passed, the assurances had been given him, and if the latter were honestly made and the resolution was to be carried out, the appellee had a right to believe that

the old company with its limited stock had been changed or would be changed, whereby an adequate capital for the business it proposed to engage in would be assured. If the charter had not been amended or changed, the company would have had no power to issue stock at $1 per share, and after the adoption of the new charter, the stock at $5 per share was out of existence. What then was contemplated by the parties? It is clear that it was understood there should be such a radical amendment in the charter that its very limited issue of stock at $5.00 per share should be annulled and its authority to issue stock should be totally changed as to the aggregate amount and the par value of its shares. The amount of the stock fixed by the new charter, was that which it was supposed by all parties would be requisite for the accomplishment of the objects for which the corporation was created ; and it must therefore be presumed that it would be all subscribed for inasmuch as the purposes of the corporation would fail unless it was.

The fact that the change in the charter was not made until sometime after the subscription of the appellee does not affect the legal aspects of the case. Had there been no alteration in the charter, the subscription would have been of no effect ; for the reason that there would have been no power to issue a share of stock of the par value of one dollar. At most the subscription can be regarded as an agreement on the part of the appellee to take three hundred shares at $1 per share, whenever the corporation should be authorized to issue stock of that kind to the extent of 250,000 shares. The power to issue such stock amounted to a condition precedent to the validity of the subscription. All the rights of the company with respect to the enforcement of the contract and of a creditor of the company, who cannot recover in an action like this unless the party sued was a stockholder at the time his claim against the corporation was created, depended absolutely upon the amendment of the charter. If this be correct the appellee did not and could not become a stockholder until the change in the charter had been effected, and the

question then would be whether the stock authorized by the change was formative stock.    We have already said, we think it was.

The Court below upon the view of the matter we have stated, rejected, without error, the appellant's 2nd, 3rd, 4th and 5th prayers.    The first and sixth prayers were also properly rejected.    The Court could not say as matter of law that this corporation was of such a character that no stockholder could presume or that it could not be fairly presumed by any stockholder, that it would not commence business until the whole amount of increased stock was subscribed for.

There was no error in granting the defendant's second prayer.    Even if the concluding clause of the prayer were conceded to be erroneous, it would not be such error as would entitle the appellant to make complaint in this Court.    The effect of it was merely to add another burden to the defense. It could not have injured the appellant's case.

Finding no error the judgment will be affirmed.

*Judgment affirmed.*

(Decided June 19th, 1902.)