## MARGARET R. SHERMAN, Assignee of SIMPSON CATERING COMPANY, Appellant, v. MARTIN SHAUGHNESSY, Respondent.

### St. Louis Court of Appeals, May 31, 1910.

1. **CORPORATIONS: Subscription to Capital Stock: Evidence Held Insufficient to Establish.** In an action by the assignee of a corporation on an alleged subscription for stock, where, though defendant signed the subscription, it was upon an understanding with the president of the corporation that the corporation would purchase liquor from him and that the corporate officers would be paid only a nominal salary, and the president subsequently refused to comply with these conditions and stated the transaction was cancelled, and no certificate was issued to defendant, he was not named as a stockholder along with the others on the books of the company, and no call was made on him for payment until he was sued years after the date of his alleged subscription, the trier was warranted in finding, if he was not bound to find, that neither the president of the corporation, the corporation itself, nor defendant ever regarded defendant as a shareholder, and there was no contract of subscription that would render him liable.

2. **ASSIGNMENTS FOR CREDITORS: Powers of Assignee: Corporations.** Under section 365, Revised Statutes 1899 the assignee of a corporation for the benefit of its creditors has full power to represent the creditors in actions on obligations for stock subscriptions to the corporation

3. **CORPORATIONS: Purchase of Treasury Stock: Governed by Law of Sales.** A contract for the sale of stock of a corporation, which, after being issued, was turned into the treasury by its owner and was set aside as treasury stock to be sold for the purpose of raising funds, is a contract of sale and not one of subscription, in the sense subscriptions were taken for the original capital stock; and such a contract is governed by the law of sales of personal property generally.

4. **SALES: Terms.** The buyer may purchase upon any terms he proposes if the seller assents thereto.

5. **CORPORATIONS: Sales of Capital Stock: Incomplete Contract.** Where defendant agreed to purchase from the president of a corporation ten shares of its treasury stock upon condition that the corporation agree in writing to purchase all of its liquor from defendant and pay its officers only nominal

salaries, the refusal of its president to sign such agreement released defendant from his liability to purchase, the contract not being fully executed.

6. ——: **Sale of Treasury Stock.** Corporate stock may be conveyed to the company by the original subscribers to be sold by it as treasury stock.

7. ——: ——: **Conditions of Sale Concurrent and Dependent.** The conditions and promises assented to by a corporation in the sale of treasury stock are concurrent and dependent, so that neither party can require the other to perform, without first offering to perform himself.

8. ——: **Purchase of Stock: Action for Price: Fraud Good Defense.** Fraudulent representations, inducing the purchase of corporate stock, are a good defense to an action against a purchaser for the price.

9. ——: ——: ——: **Tender of Stock Necessary.** Where a contract for the acquisition of corporate stock is essentially one of purchase, it is essential to a recovery of the purchase price that the stock be tendered, even though the contract is a completed one.

Appeal from St. Louis City Circuit Court.—*Hon. J. Hugo Grimm,* Judge.

AFFIRMED.

*Roland M. Homer* for appellant.

(1) The subscription contract entered into between the various subscribers was a valid contract. It was not unilateral. The promises of each subscriber to the other were sufficient consideration. These promises were made to each other for the benefit of the corporation. Railroad v. Crow, 137 Mo. App. 461; Business Men's Association v. Williams, 137 Mo. App. 575; Hill v. Mining Co., 124 Mo. 166; Glover v. Henderson, 120 Mo. 367; Lewis v. Ins. Company, 61 Mo. 538; Hotel Co. v. Smith, 13 Mo. App. 7; Haskell v. Sells, 14 Mo. App. 91; Haskell v. Worthington, 94 Mo. 560; Hotel Co. v. Wright, 73 Mo. App. 240. (2) It was not necessary to allege or prove a tender of the stock or demand for

the money. Champion v. Rischert, 74 Mo. App. 542; Haskell v. Sells, 14 Mo. App. 91; Williams v. Taylor, 120 N. Y. 244; Harwood v. Diener, 41 Mo. App. 51; McManus v. Gregory, 16 Mo. App. 375; Soap Wks. v. Sayers, 55 Mo. App. 15; Railroad v. Crow, 137 Mo. App. 461; Business Men's Association v. Williams, 137 Mo. App. 575; Coppage v. Gregg, 127 Ind. 363; Bank v. Benoist, 10 Mo. 525. (3) The trial court erred in permitting the introduction of the conversation between the defendant and the president of the catering company for the purpose of varying the terms of the contract sued upon, and further erred in holding that the result of such conversation was a release of defendant's liability. Ins. Company v. Wolfson, 124 Mo. App. 291; Koons v. Car Co., 203 Mo. 255; Ollesheiner v. Mfg. Co., 44 Mo. App. 172; Haskell v. Sells, 14 Mo. App. 101; Schaeffer v. Insurance Co., 46 Mo. 248; Hotel Co. v. Wright, 73 Mo. App. 240; Haskell v. Worthington, 94 Mo. 560; La Grange v. Mays, 29 Mo. 64; Pickering v. Templeton, 2 Mo. App. 424; Railroad v. Crow, 137 Mo. App. 468.

*R. M. Nichols* for respondent.

(1) This is an action at law, tried before the court, without instructions, and without raising any question of law during the progress of the trial, and is not reviewable by this court. Altum v. Arnold, 27 Mo. 264; Easley v. Elliott, 43 Mo. 289; Wilson v. Railroad, 46 Mo. 36; Weilandy v. Lemuel, 47 Mo. 322; Jordan v. Davis, 172 Mo. 608; Bozarth v. Legion of Honor, 93 Mo. App. 564. (2) Under the allegations of the petition and the proof the suit is on a contract of sale of stock of a corporation already organized, as distinguished from a contract of formative subscription to the capital stock of the corporation to be organized. Morawetz on Corps. (2 Ed.), secs. 46, 61; Clark v. Imp. Co., 57 Ind. 138; Weiss v. Iron Co., 58 Pa. St. 295;

Thrasher v. Railroad, 25 Ill. 393; St. Paul, etc., v. Robbins, 23 Minn. 44; Railroad v. Curtis, 80 N. Y. 219; Railroad v. Little, 14 Bush. 429; Railroad v. Hambleton, 77 Md. 341; Wood v. Jefferson, 57 Minn. 458. (3) Being a contract of sale no title passed to Mr. Shaughnessy and he did not become a stockholder until the stock was actually issued and transferred, or delivered or tendered to him. Delivery of the certificates and payment of the amount were intended to be concurrent acts, and upon failure to carry out the contract by delivery by plaintiff's assignor, plaintiff cannot recover the purchase price. The petition in this view of the case does not state a cause of action, because it does not aver a transfer of the stock, nor a delivery or attempt to deliver the stock to the defendant. The testimony conclusively shows that no issue of stock, delivery or attempt to deliver or tender of the same to the defendant was ever made. See authorities under point 2, and in addition. White v. Salisbury, 33 Mo. 150; Fine v. Hornsby, 2 Mo. App. 61; Stockwell v. Merc. Co., 9 Mo. App. 133; Boatmen's Inst. & T. Co. v. Abel, 48 Mo. 136; Greene v. Iron Co., 88 Fed. Rep. 203. (4) The contract, not being a subscription to capital stock of a corporation to be organized, but being a contract for the purchase of capital stock in a corporation already organized, the defense of fraud or rescission is as applicable as in any other ordinary contract. Wells v. Jones, 41 Mo. App. 1; Haskell v. Worthington, 94 Mo. 560; Ramsey v. Mfg. Co., 116 Mo. 313; Hess v. Draffen, 90 Mo. App. 580; Tinker v. Kier, 195 Mo. 183. (5) It was a fraud upon Mr. Shaughnessy for the president of the corporation to lead him into the belief that the corporation would do the thing specified in the proposed contract in order to get his signature to the contract for the sale of the stock, and after she had got the same, refuse to enter into the written contract. The evidence of fraud was admissible and did not contra-

dict or vary the written contract. Wells v. Jones, 41 Mo. App. 1; Haskell v. Worthington, 49 Mo. 560.

GOODE, J.—The Simpson Catering Company was a Missouri corporation, incorporated February 19, 1904. The original subscribers for the capital stock of $50,000 were Corinne Simpson, William C. Morgan and S. J. Hoge, the first of whom subscribed for 498 shares and the other two for one share each. Mrs. Simpson had obtained a concession from the Louisiana Purchase Exposition Company and this concession was transferred by her to the incorporated company as full payment of its capital stock. She was named as president of the company, William C. Morgan as vice-president and S. J. Hoge, secretary, and those three persons were named as the first board of directors. At a meeting of the company held February 20, 1904, the stockholders voted to increase the board of directors to five, and Jean P. Baerveldt was elected director, but who the fifth was is not shown. After the election of Baerveldt, Morgan resigned as vice-president and Baerveldt was chosen to fill that office. March 24th a motion was adopted, reciting the previous resolution by which the directors were increased from three to five, and at the same time Hoge resigned as director. This left as officers Corinne Simpson, president, Jean T. Baerveldt, vice-president, Wm. C. Morgan as secretary, and S. J. Hoge as treasurer, with Mrs. Simpson, Baerveldt and Morgan as directors. At the meeting February 20th, when the stockholders were the persons stated, it was voted the capital stock of the company should be paid in full by the transfer of all rights of Mrs. Simpson, and that she should transfer $25,000 of the stock subscribed by her to the treasury of the company, to *"be set aside as treasury stock to be sold for the purpose of raising funds to build a restaurant and equipping the same, said stock to be sold at par."* Later Mrs. Simpson solicited persons to subscribe for or pur-

chase shares of the treasury stock and among others, solicited defendant. The persons solicited were asked to sign the following paper, and the names of those who signed were shown at the foot of it.

"St. Louis, Mo., Feb. 18, 1904.

"We the undersigned, subscribe and agree to pay for in cash, for the number of shares of the capital stock of the Simpson Catering Company, of St. Louis, Missouri, set opposite our names. Money to be deposited with the Commonwealth Trust Company, of St. Louis, Missouri, as bankers to the credit of the Simpson Catering Company, upon the condition that all the received money is to be used for the general running expenses and the building of buildings, improvements and equipment, according to the plans and specifications and drawings made by the architect, and that upon delivery of the check or cash to the company or the trust company, a certificate of stock to the amount is to be delivered to the purchaser of the stock, of the par value $100 each, paid for at par.

"The concession is granted and is assigned to the Catering Company by Mrs. Corinne Simpson, and the bond and all stipulations have been complied with to the Fair Company.

"The building shall have a seating capacity of 1,000 persons, and shall be conducted as an eating house, restaurant, buffet and general refreshment place, during the term of the St. Louis World's Fair Exposition is in progress.

"The capital stock of the company is fifty thousand dollars, par value, one hundred dollars each, and fifteen thousand dollars of this stock is *to be sold at par*, and ten thousand dollars will be left in the treasury for raising further funds if necessary.

"It is agreed by the board of directors that the subscriber of this fifteen thousand dollars will be paid his money back first before any dividends are paid on the

promoter's stock, and that there is a sinking fund set aside for the actual daily rental expenses of the cost of the building to not be used for any other purposes until the fifteen thousand is paid back to the holders of the stock, who advanced the money and then the profits derived from the earnings shall be paid in weekly dividends for the whole stock.

"The board of directors shall meet once a week and declare such dividends as may be necessary from the profits derived.

| "Name. | Residence. | Shares |
| --- | --- | --- |
| . . . | . . . . | . . . . |
| "M. Shaughnessy & Co. | | 10 shares |
| . . . . | . . . . | . . . . |

The Simpson Catering Company fell into insolvency and August 6, 1904, Corinne Simpson, the president, by authority of the board of directors, executed a deed of assignment to plaintiff Mary B. Sherman, conveying to her all the assets for the benefit of creditors of the company. Plaintiff instituted this action as assignee, to recover from defendant, Martin Shaughnessy, $1000, alleged to be owed by him for ten shares of stock subscribed for or agreed by him to be purchased, under the name of M. Shaughnessy & Co., the style under which he did business. It is important to state the dates when the so-called subscription paper was signed. The first two signers, signed February 20th and the remainder at dates ranging from March 3, 1904, to June 4th of said year. These dates are taken from a stock book of the Simpson Catering Company wherein shares were transferred to the various subscribers on the different days between the dates mentioned. Defendant's name does not appear on the stock book because, in fact, no shares ever were transferred into his name, nor was a certificate of shares ever issued to him; but he was solicited by Mrs. Simpson to take shares about the middle of April, and at that time signed the paper. It was in testimony that Jos. S. Laurie signed afterward, and

induced Geo. P. B. Jackson to do so, and Laurie testi-
fied he signed in reliance on other persons having signed
before, thereby becoming stockholders in the concern.
Defendant testified as follows about how he came to
sign the paper supra. He was engaged in the whole-
sale whisky business in St. Louis and also conducted
the Lindell Hotel. Mrs. Simpson called on him three
or four times about taking some stock and outlined the
policy of the company, which was to deposit all the earn-
ings in the Commonwealth Trust Company to pay the
preferred shares. She presented a paper to defendant,
saying if he would buy ten shares of the stock of the
company, it would buy all its whiskies from him. De-
fendant looked over the paper and finally said to Mrs.
Simpson, in substance, there was nothing to keep the
officers from voting themselves any salary they wished
out of the net earnings but she said they would not do
that; that they would deposit their entire earnings with
the Commonwealth Trust Company, the officers would
receive only a small nominal salary, and they would buy
all their whiskey from defendant. She told defendant
she wished he would sign the paper for her as she had
been greatly disappointed in trying to get things in
shape. He declined to sign unless she would put her
agreement in writing—*i. e.,* to buy all the whiskey the
restaurant would use from him, the salaries of the offi-
cials should be nominal, and the earnings should be de-
posited with the Commonwealth Trust Company. She
agreed to sign a paper containing those terms, but asked
defendant to sign the paper supra, saying she would
come around in a few days and execute his paper. He
had an instrument drawn up, embodying the conditions
on which he would take stock, as we have stated, and
which instrument is in evidence. With the understand-
ing that such an instrument should be signed by Mrs.
Simpson for the company, defendant appended his signa-
ture to the above paper for ten shares of stock and either
the day he did so or shortly afterward, Mrs. Simpson

returned to him on a matter of business, whereupon he presented her with the paper he had had prepared, showing the conditions on which he would take the stock. She became angry, refused to sign the paper, said she would have their agreement cancelled and walked out of the office. Defendant never saw her afterward, no stock certificate was issued to him, no stock was transferred to him on the books of the company, he never was called on to pay for any shares, never participated in any of the business of the company and the entire transaction passed out of his mind and was not remembered until he was called on by the assignee to pay one thousand dollars. It is in defendant's testimony, and there is none to the contrary, that when he presented the paper embodying the terms on which he would subscribe for or purchase stock from Mrs. Simpson, she said she would not sign it but would call the deal off and would cancel it. A ledger or stock book of the company was introduced in evidence and showed no shares of preferred or common stock in the name of defendant. Said ledger contained a list of the holders of preferred shares, running down to May 21, 1904, and amounting, we estimate, to $15,600, of outstanding preferred shares, leaving $9400 still in the treasury. Under date of April 19, 1904, the ledger showed $11,300 of preferred shares in the hands of various parties, with $13,700 of said shares still in the treasury. But during April, $4300 preferred shares were taken by other persons, as shown by the ledger, and this would leave $9400 in the treasury. The case was tried without a jury and at the conclusion of the evidence the court found the issues in favor of defendant and entered judgment accordingly, no declarations of law having been requested by either party.

Neither Mrs. Simpson, nor the Catering Company ever regarded defendant as a shareholder and neither did he regard himself in that light. Everything that transpired points to this conclusion, which the court,

as trier of the facts, might draw, even if we allow it was
not bound to be drawn. Failure to issue a certificate
to defendant, to name him as stockholder along with the
others on the books of the company, to call on him for
payment until he was sued in the present action years
after the date of his alleged subscription, are incompati-
ble with the idea that he was looked on as a stockholder.
Mrs. Simpson said when she refused to sign the paper
she had agreed to sign, the matter of his taking stock
would be declared off and the whole transaction can-
celled. These being the circumstances in proof, they
did not constitute a contract of subscription that would
render defendant liable even at the suit of creditors
or of an assignee for their benefit clothed with full
power to represent them, as plaintiff is clothed under
our statute as it now stands. [R. S. 1899, sec. 365;
Grand Avenue Bank v. St. Louis Union Trust Co., 135
Mo. App. 366, 115 S. W. 1071.] The abortive trans-
action between defendant and Mrs. Simpson ought not
to be regarded as even an attempt on his part to sub-
scribe for capital stock of the company, and though the
papers said the signers subscribed and agreed to pay
for shares, the essential nature of the transaction as
shown by the facts, ought to be determined and allowed
to control the decision. The statutes regarding manu-
facturing and business companies, provide how stock
shall be subscribed, and who shall be the subscribers in
the first instance; saying, among other things, the ar-
ticles of association of the company shall state the num-
ber of shares into which the stock is to be divided, the
par value thereof, that the same has been *bona fide* sub-
scribed and one-half paid up in lawful money of the
United States, that the articles shall show the names
and places of residence of the shareholders and the num-
ber of shares subscribed by each; further, that if it is
desired to class part of the shares as preferred, the ar-
ticles shall set out the amount of the preferred stock
and the number of shares subscribed by every sub-

scriber. [R. S. 1899, sec. 1312.] When the Simpson Catering Company was organized, all the shares were subscribed as common stock by Mrs. Simpson, Morgan and Hoge, the former taking all but two shares. It is manifest, therefore, defendant did not subscribe originally for any of the capital stock, which be it noted, was all common stock. The scheme for the creation of preferred shares must have been an afterthought or else they were illegal. By the very words of the statute if it was desired when the corporation was organized to have preferred stock, the articles of association were required to show this and show who had subscribed for said stock. The company was incorporated February 19, 1904, and immediately afterward, on the 20th, the scheme was devised, or at least acted upon, to constitute part of the stock preferred. This scheme was for Mrs. Simpson to turn over $25,000 shares par value of her stock to the company, of which $15,000 would be sold at par immediately and $10,000 left in the treasury for raising further funds. The $15,000 worth of shares so to be sold were to be given a preference in this way: The subscribers for those shares were to be paid back their money before any dividends were paid on the promoters' stock. It was not contemplated these preferred shares should be subscribed for in the sense subscriptions were taken to the original capital stock; in fact, that would have been an impossibility; for all the capital stock had been previously subscribed. What was contemplated and intended was a sale of the shares turned into the treasury by Mrs. Simpson. This was declared in so many words in the resolution of the then shareholders of the company on February 20th, wherein it was voted and carried that twenty-five thousand dollars of the stock of the Simpson Catering Company be set aside as treasury stock *to be sold* for the purpose of raising funds. That motion was adopted at the same meeting when it was voted the transfer of the World's

Fair Concession by Mrs. Simpson to the company should be in full payment of the entire capital stock. Plainly, the company and all of the then shareholders, intended the treasury stock should be sold, for they so stated, and what defendant intended to do was to buy ten shares of it on certain conditions; at any rate the court, as trier of the facts might thus find, for defendant so testified, testifying further Mrs. Simpson solicited him to buy. Looking on his transaction with her as an attempt to sell, it is governed of course, by the law of sales of personal property generally; one part of which is that a person to whom a seller proposes to dispose of an article, may buy on any terms he wishes, provided the seller will assent to them. The condition on which defendant was willing to buy was that Mrs. Simpson, who was representing the company in an attempt to sell to him, should sign a paper in behalf of the company by which it would agree to buy all the whiskey it would use from defendant; agree, further, the salaries of the officers should be nominal (to-wit, at a sum agreed on between Mrs. Simpson and defendant) and that the company should deposit all its net earnings with the Commonwealth Trust Company for paying off the preferred stock at the close of the World's Fair. Mrs. Simpson agreed to sign such a paper as part of the contract for the sale to defendant of ten shares of stock, but she subsequently refused to sign it, and we see no possible conclusion except that, as she said, this ended the proposed sale and cancelled the matter; the contract not having been fully executed. [1 Cook, Corporation, sec. 137, p. 398.] To hold defendant responsible on those facts would be to carry into effect as a complete agreement, one that broke down because a party to it repudiated the main condition on which it was understood it should become effective. That stock may be turned in to a company by the original subscribers to be held and sold by the company as treasury stock is settled law and such a transaction has been recognized

as valid by the courts. [1 Cook, Corp. (6 Ed.), sec. 46, p. 182; Lake Superior Iron Co. v. Drexel, 90 N. Y. 87; Ins. Press v. Montauk, etc., Co., 103 N. Y. App. Div. 472, and other cases cited in note.] And that the conditions and promises assented to by the company in the purchase of treasury stock are concurrent and dependent, so that neither party can require the other to perform without first offering to perform himself, has been ruled; as it naturally would be, inasmuch as a contract of sale must be enforced according to its terms, if at all. [Railroad v. Robbins, 23 Minn. 439; Baltimore, etc., Railroad v. Hambleton, 77 Md. 341; Green v. Sigua Iron Co., 88 Fed. 203; Id., 104 Fed. 854.] It is also the law that fraudulent representations which induce a purchase of corporate stock, constitute a good defense against an action for the price. [Tinker v. Kier, 195 Mo. 183, 94 S. W. 501.] However, the decision ought not to be put on the ground that defendant was induced to buy the stock by fraudulent representations; but rather on the ground that he was induced to sign the paper wherein he appeared to subscribe or purchase, by Mrs. Simpson's promise to sign another paper as part of the transaction which should set forth the terms of the deal, and that Mrs. Simpson repudiated her promise, not with an intention to defraud defendant as a purchaser, but rather because, on reflection, she preferred to let the sale fall through. Properly regarded the case is totally different from cases in which the facts showed the defendants had subscribed originally for part of the capital stock of the company and where the action was for the price of the subscription. This distinction has been noticed in numerous decisions and where the contract is essentially one of purchase, even if it is a completed contract, it is held the purchase price cannot be recovered without a tender of the stock. [Wood Harv. Co. v. Jefferson, 57 Minn. 456; Clark v. Improvement Co., 57 Ind. 135; Thrasher v. Railroad, 25 Ill. 393; Gettysberg Nat'l Bank v. Brown, 95 Md. 367.] Plaintiff re-

lies on various authorities, including the following: New Lindell Hotel Co. v. Smith, 13 Mo. App. 7; Kirkwood, etc., Co. v. Van Ness, 61 Mo. App. 361; Shelby Co. v. Railroad v. Crow, 137 Mo. App. 461, 119 S. W. 435; Business Men's Assn. v. Williams, 137 Mo. App. 575, 119 S. W. 439; Kansas City Hotel Co. v. Hunt, 57 Mo. 126; Haskell v. Worthington, 94 Mo. 560, 7 S. W. 481. Those cases are totally unlike this one in two regards: The contracts sued on were subscriptions to the original capital stock of the company, or else to an increase of the capital stock, and it appeared the subscriber had been recognized as a stockholder and had acted as such, thereby estopping him to deny he had taken shares even though no certificate had been issued to him. The most essential difference is that the contracts declared on were complete contracts, or else constituted subscriptions to the stock. As there was no complete contract to purchase, the judgment should be affirmed.