## JOHN H. MORGAN AND FRANK B. SMITH, RE-CEIVERS OF THE MARYLAND STORAGE COMPANY *vs.* FAIRFAX S. LAND-STREET.

*Corporations—Subscriber to Capital Stock Not Liable Until Whole Amount Is Taken—Waiver of This Condition.*

When the number of shares and the amount of the capital stock of a corporation are fixed by its charter, a subscriber to the shares of stock is not liable on his subscription until the whole number of shares have been unconditionally subscribed.

A subscriber to the original capital stock of a corporation does not waive the defence that all of the stock was not taken by making his subscription at a time when he knew that the corporation was already engaged in business in a small way without having all of its stock subscribed for, but when a

larger business was then contemplated, and when, although he was elected a director, he never qualified as such, or attended a meeting of the directors or stockholders, and did not participate in the business carried on by the corporation.

*Decided January 20th, 1909.*

Appeal from the Circuit Court for Baltimore County (BURKE, C. J.).

*Plaintiffs' 1st Prayer.*—The plaintiffs pray the Court to instruct the jury that since it appears from the uncontradicted evidence in this cause that the Maryland Storage Company of Baltimore City, on June 10, 1907, and for nearly a year previous thereto, was engaged, to the knowledge of the defendant, in carrying on an active warehouse business, and had incurred and was incurring liabilities; and that the said company's capital stock, to the knowledge of the defendant, had not been fully taken or subscribed for, it therefore follows that the fact that all of said capital stock was never taken is no defense to this action; and if the jury find from the evidence (1) that the defendant signed the subscription agreement dated June 10, 1907, and offered in evidence, to $30,000 of said company's capital stock; (2) that personal demand was made by said company upon the defendant for the payment of his said subscription more than ninety days before the institution of this suit; (3) that the defendant did not pay the same, and (4) that the plaintiffs are the receivers for said company, that in this event the plaintiffs are entitled to recover against the defendant to the extent of his said subscription. (*Rejected.*)

*Plaintiffs' 2nd Prayer.*—That since it appears from the uncontradicted evidence in this cause that the Maryland Storage Company was incorporated on or about November 18, 1904, with an authorized capital stock of $150,000, divided into 3,000 shares of the par value of $50 each; that the company organized by the election of directors and officers on or about December 12, 1904, that thereafter, in July, 1906, the

said company's capital stock was duly increased to $250,000, divided into 5,000 shares of the par value of $50 each, and that the defendant's subscription (if the jury find said subscription) was to said increased capital stock, it therefore follows that the fact that all of said capital stock was never subscribed is no defense to this action, and that if the jury find from the evidence (1) that the defendant signed the subscription agreement dated June 10, 1907, and offered in evidence, to $30,000 of said company's capital stock; (2) that personal demand was made by said company upon the defendant for the payment of his said subscription more than ninety days before the institution of this suit; (3) that the defendant did not pay the same, and (4) that the plaintiffs are the receivers for said company, that in this event the plaintiffs are entitled to recover against the defendant to the extent of his said subscription. (*Rejected.*)

*Plaintiffs' 3rd Prayer.*—That if the jury find from the evidence that the defendant, on or about June 10, 1907, signed the written subscription offered in evidence, to $30,000 of the capital stock of the Maryland Storage Company, and that at the time of making said subscription the said company, to the knowledge of the defendant, had been engaged in an active warehouse business since on or about July 1, 1906, and had incurred and was incurring liabilities, and that the defendant also knew that the company's capital stock had not been fully taken and subscribed for, that in this event the jury are instructed that the fact that all of said capital stock was never taken is no defense to this action, but that the plaintiffs are entitled to recover against the defendant to the extent of his said subscription, provided the jury further find from the evidence that personal demand was made by said company upon the defendant for the payment of his said subscription more than ninety days before the institution of this suit, that the defendant did not pay the same, and that the plaintiffs are the receivers for said company. (*Rejected.* )

*Plaintiffs' 4th Prayer.*—That if the jury find from the evidence that the Maryland Storage Company was incorporated

on or about November 18, 1904; that the plaintiffs are the
receivers for said company; that the defendant on or about
June 10, 1907, signed the written subscription offered in evi-
dence, to $30,000 of the said company's capital stock, and
that at the time of making such subscription the defendant
knew: (1) that the said company on or about July 1, 1906,
had commenced and had since been prosecuting an active
warehouse business under the contract with the Western
Maryland Railroad dated June 12, 1906, and offered in evi-
dence, of the contents of which contract the defendant had
knowledge; (2) that the company was about to begin the
construction of a warehouse upon its property at York and
Johnson Streets; and (3) that the capital stock of the com-
pany had not been fully taken and subscribed for; and if the
jury further find from the evidence that upon or after mak-
ing his said subscription the defendant consented to become
a director in said company, and acquiesced in his election
as such director, knew that the company was continuing to
carry on its business and was incurring liabilities; learned
that it had contracted for and started to erect a warehouse
upon its property; advised the company's Vice-President and
General Manager with regard thereto; visited the said prop-
erty in the fall of 1907, and examined and approved the work
there being done upon the warehouse; consented to assist said
company in raising funds for the completion of said ware-
house, and about August or September, 1907, promised to
make payments on account of his said subscription; and if
the jury further find from the evidence that at the time of
each and all of the transactions mentioned above (if the same
are found by the jury), the defendant new that the said
company's capital stock was not fully subscribed for, that in
this event the jury are instructed that the fact that the entire
capital stock of said company was never subscribed is no de-
fense in this cause, and the plaintiffs are entitled to recover
against the defendant to the extent of his said subscription;
provided the jury find from the evidence that personal de-
mand was made by said company upon the defendant for the

payment of his said subscription more than ninety days be-
fore the institution of this suit, and that the defendant did not
pay the same.   (*Rejected.*)

*Plaintiffs' 5th Prayer.*—That if the jury find from the
evidence that the plaintiffs are the receivers of the Maryland
Storage Company; that the ·defendant signed the subscription
agreement dated June 10, 1907, offered in evidence, and that
personal demand was made upon the defendant for the pay-
ment of his said subscription more than ninety days prior to
the institution of this suit, then the verdict of the jury must
be for the plaintiffs, even though the jury also find that the
whole authorized capital stock of the Maryland Storage Com-
pany was not subscribed; provided the jury further find that
the defendant knew that all of said capital stock was not sub-
scribed for, and with such knowledge participated in the
affairs of the company in a way which could only properly
be done upon the assumption that the subscribers intended to
·proceed with the stock partially subscribed.   (*Rejected.*)

*Defendant's 2nd Prayer.*—The Court instructs the jury
that if they find from the evidence that the stock of the Mary-
land Storage Company authorized by its charter, to wit:
Three thousand shares, at fifty dollars a share, was never
fully subscribed, then, even though they find that the de-
fendant signed and delivered the subscription paper offered
in evidence, as stated by witnesses for the plaintiff, their ver-
dict must be for the defendant, unless they further find that
after such subscription and with knowledge that said capital
stock had not been fully subscribed the defendant participated
in the conduct of the business of the said company in such a
way as to indicate that he consented to and acquiesced in the
company's proceeding in its business before the whole amount
of said stock was subscribed, and the jury are further instruct-
ed that even if they find that the defendant, after knowledge
that said stock was not fully subscribed, consented to become
a director, but did not act as such, and promised to pay part
of his subscription, such facts do not amount to such partici-

pation in the business of the company as would make the defendant liable under such subscription.  (*Rejected.*)

*Defendant's 3rd Prayer.*—And further prays the Court to instruct the jury that so much of the second alleged amendment to the charter of the Maryland Storage Company, dated July 20th, 1906, as undertakes to increase the number of authorized directors of said company from nine to twelve is void, and conferred no power upon said company to select or have more than nine directors, and it being undisputed that said company had nine other legal directors at the time of the attempted election of defendant as one more, and that defendant never acted as such, then defendant never became a director of said company, either in law or fact.  (*Rejected.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, THOMAS, WORTHINGTON and HENRY, JJ.

*Joseph C. France* and *Stuart S. Janney* (with whom were *A. C. Ritchie* and *Gibson & Smith* on the brief), for the appellants.

1. The defense depended upon by the appellee is based upon the well-known principle that when the charter of a corporation fixes the amount of its capital, the law implies a condition in subscription to its formative stock, that the amount fixed in the charter shall be raised before the corporation creates any liabilities, and that a subscriber may depend upon a violation of the condition as a defense to an action on the subscription agreement. The cases where this Court has recognized the defense and defined its application are as follows: *Hughes* v. *Antietam Manufacturing Co.*, 34 Md. 332; *Hager* v. *Cleveland,* 36 Md. 476-491; *Fiery* v. *Emmert,* 36 Md. 474; *Garling* v. *Baechtel,* 41 Md. 305; *Stillman* v. *Dougherty,* 44 Md. 384; *Morrison* v. *Dorsey,* 48 Md. 461; *Musgrave* v. *Morrison,* 54 Md. 164; *Gettysburg National Bank* v. *Brown,* 95 Md. 367.

The recognition of this defense is a relaxation for the pro-

tection of investors of the well-known doctrine that the stockholders' liability in an insolvent corporation constitutes 'a trust fund for the creditors. The equities of the creditors being generally considered superior to those of stockholders, who take their chance of large profits and must be held to have assumed a corresponding risk of loss. *Cook*, Vol. 1, sec. 166.

The Courts, therefore, are careful to confine the privileges of the defense to deserving defendants, and will not extend them to those whose rights have not been invaded by the premature start of the corporation, and who are merely seeking to dodge the stockholders' liability. "The defense was intended to protect subscribers who in good faith objected to the organization of a company when its capital stock which was necessary to the enterprise had not in fact been taken, but it was never intended and Courts will never permit it to be used as an instrument of fraud." *Morrison* v. *Dorsey*, 48 Md. 461.

It is a mere presumption that the condition of full subscription exists, founded upon the probable understanding of the parties. The matter involves no question of public policy and the Courts will never presume the presence of the condition when the facts show it could not have been the mutual understanding. For example, the whole theory being founded upon a presumption that the subscriber depended upon the corporation raising the amount of stock fixed in the charter or subscription agreement. The defense has no application where the amount of capital is not fixed therein. *Kennebec & Portland R. R. Co.* v. *Jarvis*, 34 Me. 360; *Warwick R. R. Co.* v. *Cody*, 11 R. I. 131; *Hambleton Co.* v. *Rice*, 7 Barb. Sup. Ct. (N. Y.) 157-166; *Lynch* v. *E. I. & M. R. Co.*, 57 Wis. 432; *Hager* v. *Cleveland*, 36 Md. 491.

Nor does it arise where the charter expressly authorizes the corporation to start before all of the stock is subscribed. *Morawetz, Private Corp.*, Vol. 1, sec. 138.

By analogy and in reason it also follows that if the corporation is already a going concern at the time of the subscrip-

tion and has already created and is continuing to create liabilities to the knowledge of the subscriber, and the subscriber also knows that its stock fixed in its charter is not fully subscribed, the presumption cannot arise "that the amount fixed in the charter shall be raised before the corporation creates any liabilities." That would be a foolish presumption, for the contrary is already the fact.

This Court has in a dictum already expressed itself on the point, in the case of *Musgrave* v. *Morrison,* which was a similar suit to the one at bar. It was here proved that the defendant knew at the time of his subscription that the corporation was engaged in active business, and that its stock was not fully subscribed, and the Court said: "Under these circumstances it might well be argued that his subscription was not made upon the condition that the company was not to organize until the whole number of shares had been taken." *Musgrave* v. *Morrison,* 54 Md. 164.

It is true that the Court did not rest its decision upon that ground. As there was conclusive evidence of an estoppel, even if the condition had ever existed, it was not necessary to do so. It is for this reason that the defense is never allowed where the subscription is to increased stock and not original stock. *Gettysburg Bank* v. *Brown,* 95 Md. 386-7. For when increased stock is in question the corporation must have been a going concern before the subscription, and the presumption does not arise. *Morawetz, Private Corpr.,* Vol. 1, sec. 142.

In the case at bar at the time of the appellee's subscription, the Maryland Storage Company had been for a year engaged in active business, with receipts of $1,500 a month, under a contract negotiated by the appellee binding it to pay a rental of $500 a month and to construct a warehouse at York and Johnson Streets. The appellee admits that he was perfectly familiar with that fact, and with all the business conducted by the company. He also admits that he knew at the time that the company's capital stock was not all subscribed. His *first connection* with the company as subscriber (unlike the case of the subscriber in *Bank v. Brown*), took place at a time

when the company was, to his knowledge, actually engaged in business.

Under such circumstances it approaches the frivolous to say that "it is presumed that capital, to the amount fixed in the charter, would be raised before the corporation created any liabilities." He knew such liabilities already existed and that the capital was not raised. The only case where this point is directly treated is *Arkadelphia Mills* v. *Trimble, 54* Ark. 519. See also *Nutter* v. *R. R. Co.,* 72 Mass. 85.

2. The evidence was legally sufficient to show a waiver of any defense of partial subscription.

Landstreet did not actually sign the subscription until June 10, 1907, But he personally bound himself to subscribe in February, 1905, and his interest in the company and participation in its affairs may be regarded in the light of that fact.

What are the acts showing this consent and acquiescence?

As a prospective subscriber, and with Timanus' letter before him, saying he was delaying financing the company until an agreement with the Western Maryland Railroad Company was signed, he negotiated the agreement of June 12, 1906, which bound the company to a monthly rental of $500 and to an active business requiring capital, and to the construction of a warehouse. It is moderate to say this was an acquiescence in the company's proceeding with its business. He was starting it, and he knew its condition.

When he voluntarily subscribed, he knew that the company was already in business and under large liabilities. This was a very practical acquiescence in the start that he knew had been made.

When talking to Brady, he advised him to go along with the contract as it then existed, and not to undertake any further enterprise. This was an acquiescence in the liabilities that had been incurred, with which he was familiar, and in a continuance of them.

When he subscribed, his understanding was that the company was to borrow money for its building on his subscription. If he regarded his subscription as conditional, this was

a great wrong upon the proposed lender, and if he did not so regard it, the liability sought to be enforced is no greater than what he intended to undertake. This understanding is in itself clear evidence of his consent that the company should borrow the money, which is to create liabilities.

He visited the building when it was under way and congratulated President Timanus on the showing. This was an acquiescence in what had been done.

He then promised to send $5,000 on account of his subscription. This was a very encouraging acquiescence.

He accepted an election as director. Will directors be allowed to set up their omission to attend meetings as a defense to their subscription agreement?

He agreed to intercede with the Western Maryland Railroad Company to have them lend money to the company to enable it to complete the building.

He then showed his consent that the company should continue to proceed with its business.

During all of this time the appellee knew that the corporation's capital was only partially subscribed.

It is submitted that each of the above segregated facts would be legally sufficient to indicate his consent to the company's operations. Their accumulated force is sufficient to show not only an acquiescence in what was done, but that he was one of the moving spirits in the enterprise. And it is not strange that when called upon to pay his money he never thought of the possibility of making the defense now insisted upon, but set up an alleged private understanding with Brady. It is respectfully submitted that the lower Court erred in ruling *as a matter of law* that the defendant had not waived the defense of partial subscription.

3. The appellee is estopped from setting up the defense of partial subscription.

At the time of signing the subscription agreement the appellee knew that the corporation was in a position where it would become financially responsible upon its failure to carry out the terms of the agreement of June 16, to comply with

which it had given or was under obligation to give a heavy bond. He knew that it was employing the funds of other stockholders in doing business under that agreement, and that it would employ more of these funds of other stockholders if it carried out such agreement, or would defraud creditors if it did not use such money. He knew that its stock was not fully subscribed, and put his name to the unconditional subscription for the express purpose of getting others to usbscribe and pay, and his subscription was used as he had authorized, for the purpose of inducing others to subscribe, and also to pay their subscriptions.

His subscription was used as the basis for the action of the board in contracting for the construction of the warehouse by the Hopkins-Barnett Company, and therefore on the faith of it their money was spent in labor and materials, and while two-thirds of his subscription would have paid the company's indebtedness, he declined to pay.

To allow this defense in a case of this character will not only open the way to future frauds, but a present and very oppressive hardship will have been visited upon the other subscribers who paid their money on the faith of these acts, and on creditors who trusted the corporation.

This Court, in treating of verbal agreements and private understandings in connection with stock subscriptions, has said: "The defendant putting upon paper an unconditional promise to pay may have induced others not only to subscribe, but to pay, and his attempts now to shield himself by his private understanding may be a fraud upon others who have thus been induced to subscribe and pay." *Scarlett* v. *Academy of Music*, 46 Md. 122.

In the case at bar the elements are proved which in the *Academy of Music Case* are suppositions. This appellee *did* subscribe unconditionally, *for the purpose* of inducing others to subscribe and pay. By so doing, others were thereby induced to subscribe and *pay*. Having stood in position to take the profits if the enterprise was successful, he would now avoid all liability upon its failure, and that by a legal fiction

which he never thought of, but which skillful counsel have evolved for his protection.

The receivers in this case represent the stockholders, as well as the creditors of the Maryland Storage Company, and it is respectfully submitted that the appellee will not be permitted to commit this grievous wrong upon them and then step aside and let the weight of his actions rest upon other shoulders, but he will be held to be estopped by his actions from setting up the defense of partial subscription.

Counsel for the appellee argued below that the condition which is implied in a contract of subscription is not as heretofore believed that the corporation shall not embark in its business before its stock is fully subscribed, but quite different from that, to wit, that the subscriber shall not be called upon to pay his money until the full amount of capital stock is taken. That he can only be deprived of this defense by the actual casting of votes in favor of the company's business, or the creation of its liabilities, or by participation in the corporate affairs *within the corporation,* meaning thereby as an officer or director and in such capacity.

The appellants submit that even measured by the erroneous standard thus contended for, the liability of the appellee in this case would be for the jury, there being evidence *legally sufficient* to show the character of participation mentioned. But the argument is fallacious and the fallacy consists in mistaking the result of the condition when implied and not waived for the condition itself.

A corporation with its capital fixed in its charter is not authorized to incur liabilities in the course of its business until all of its stock is taken, as the subscribers are presumed to have subscribed with reference to the amount named in the charter as a minimum. To violate this principle is to violate an implied condition of the subscription, and *the result is* that the subscriber is not liable for calls unless he has consented to or acquiesced in the corporation's proceeding with its business. *Morawetz, Private Corporations,* sec. 149; *Gettysburg Nat. Bank* v. *Brown,* 95 Md. 386.

The converse of the proposition has frequently been ruled upon and demonstrates this. Thus it is clear that if a corporation *is* authorized by its charter to begin the prosecution of its business before all of its capital stock is taken, the subscribers cannot have subscribed with reference to any particular amount of capital, and the result is that they will be liable to be called upon to contribute to the extent of their undertakings. *Morawetz, Private Corp.,* sec. 138.

This Court has made the true condition clear in the last opinion heretofore quoted: "It is not to be supposed that a reasonably prudent person will invest in a corporation which is not to be supplied with sufficient capital with which to prosecute its affairs, and therefore it is that a presumption arises that the amount fixed in the charter shall be raised before the corporation creates any liabilities."

And, again, the waiver of the condition may be shown by acts indicating that the subscriber has consented to the company's proceeding with its business before all of its stock is subscribed. *Gettysburg Nat'l Bank* v. *Brown,* 95 Md. 386.

That the condition may be waived by acts or declarations either prior or subsequent to organization has also been decided in this State. *Fiery* v. *Emmert,* 36 Md. 474.

The same contention here made was made in a Minnesota case, and the Court's treatment of it is apposite and enlightening. The Court said: "A subscriber may waive the defense that the full capital stock of the corporation has not been subscribed. This waiver may be either express, or implied from the acts or declarations of the subscribers. The appellant claims that the waiver must amount to an estoppel; the respondent, that acts or declarations of a subscriber showing an intent not to object that the full stock has not been subscribed are sufficient, although a technical estoppel may not be shown. Some of the cases cited use the word 'waived,' others the word 'estopped.' An estoppel *in pais,* as the word is usually employed and applied, includes the fact that the party claiming the estoppel relied upon and acted upon the acts or declarations, so that he will be prejudiced if the other

party is not held to them. We do not find that the cases re-
ferred to using the word 'estopped,' and holding that the
subscriber was or was not estopped, use the word in this
sense. So in *Hager* v. *Cleveland,* 36 Md. 476; *Garling* v.
*Baechtel,* 41 Md. 305 (and others cited), the Courts, in stat-
ing what will estop the subscriber, or prevent his being heard
to make the objection, refer only to his acts, and do not in-
clude the fact that they did influence others. If a technical
estoppel were required to prevent a subscriber withdrawing
his subscription on the ground that the full stock has not
been subscribed, much fraud might be permitted  *  *  *
The safer rule is that if his acts are of such a character that
either the corporation or subscribers may have been induced
by them to act, and will be prejudiced if he be permitted to
withdraw, he shall be held to have waived, or be estopped
to assert the defense." *Masonic Temple* v. *Channel,* 43 Minn.
353.

The results of the adoption of the theory of the appellee
would be disastrous. It would create a crowd of *dormant*
subscribers, who might be held out to the world as such; credit
might and would be procured on their names; they might en-
courage and advise the officers in the conduct of the corporate
affairs, and, carefully keeping the full amount of stock from
being taken, and being also careful not to have any official
connection with the corporate management, they would be in
position to take up the profits accruing to them as stockholders
in the event of success, and, in the event of failure, snap their
fingers at stockholders who subscribed on the faith of their
subscription and who paid their money when called upon, and
at creditors, who relied upon the standing their subscriptions
gave the company and gave it credit.

*Benjamin A. Richmond* and *Edgar H. Gans* (with whom
was *J. F. C. Talbott* on the brief), for the appellee.

There was nothing in the nature or kind of business of the
storage company, or in its situation, which would deprive the
appellee of the benefit of the condition of his subscription.

Its certificate of incorporation states that it is formed for the purpose of carrying on a forwarding and warehousing business in this State, and for the construction, owning, chartering or leasing of steamboats, wharves, docks, roads, vehicles or other property required for the purpose of such forwarding and warehousing business, and for the buying, selling, mortgaging, leasing, improving, disposing of, or otherwise dealing in lands in this State, etc.  These powers are very broad, and contemplated the doing of several things, some of which might require but little capital, and some of which would require a large amount of capital, depending upon the will of the company.  In this case it appears that the storage company from the very start contemplated expending its whole capital in these enterprises, and not merely a part of it.  It began doing some business on July 1, 1906, at Brown's wharf, a place which it had leased from the Western Maryland Railroad Company on June 12, 1906.  But at that time it contemplated the expenditure of a large amount, if not all, of the money realized from its whole capital stock. for by the second paragraph of this lease, it agreed to construct a modern warehouse for the storage of merchandise and to commence the same forthwith, and to endeavor to complete the same on or before the first day of January, 1907.  This, then, was the main object and purpose of its incorporation, and especially of its purpose to get together a capital of $150,000. It required little or nothing in the way of capital to merely rent Brown's wharf and carry on a little storage business there, but it required a large capital to construct this warehouse.

When, therefore, having in the meantime done nothing toward this building, Mr. Brady, on behalf of the storage company, came to appellee in June, 1907, and got the subscription now sued on, there was nothing in the kind of business contemplated by the company which would rob this subscription of the rule of the condition therein which has been applied by this Court in *Hughes' Case,* 34 Md.; *Cleveland's Case,* 36 Md.; *Garling's Case,* 41 Md., or the *Gettysburg*

*Bank Case,* in 95 Md., or which has been applied in the many other cases. Some of these were corporations for the putting up of buildings, such as hotels, warehouses; some for the building of railroads, and so on. Taking the object and purpose of the storage company as manifested by its board of directors, the principal one of which was the erection of a costly building, there is nothing to distinguish this corporation in *kind* from the other corporations in Maryland and elsewhere, to which the rule has been applied.

In *Musgrave's Case,* 54 Md. 164, although JUDGE ROBINSON says that the application of the rule of implied condition in the subscription might not extend to a building association the same as it would to other corporations, yet he expressly fails and refuses to place his decision of the case in hand on any such distinction, but proceeds to place it on the ground of waiver or estoppel, thus finally clearly applying the rule to the case in hand, notwithstanding it was a building association. For if he had not applied the rule of condition in the subscription to the case in hand, it would have been wholly unnecessary and improper to go ahead and decide that the condition in that case had been waived. There would have been no necessity to resort to the question of estoppel if the rule did not apply to a building association.

JUDGE ROBINSON cites no authority for any such distinction, and after a diligent search we have been unable to find any case making any such distinction. In none of the cases is the reason of the rule based upon the *kind* of corporation, provided it is a stock corporation calling for the expenditure of money to a certain amount under its charter.. The reason of the rule is to comply with the mandate of justice, and to give effect to the obvious intention of parties. It is based upon the idea that a man might be willing to embark his money in a certain proportion along with others, provided they were putting up money in like proportions to a total amount, but should not in equity and justice be required to put up his money by the corporation until its affairs had been fully financed according to the amount stated in its charter,

so as to insure the success of the enterprise. If this is the reason of the rule, it is impossible to see on what ground a distinction can be made between corporations in the application of the rule, no matter what is the object of the enterprise, if both authorize and require the expenditure of money. If there is anything so peculiar in the financing of a building association as to abrogate the rule so far as building associations are concerned, it has never been so decided in Maryland. The Court in *Musgrave's .Case* did not so decide, but placed its decision upon an entirely different ground, which decision could not have been made without a full recognition of the applicability of the rule to even a building association.

Before defendant's subscription, all that the company had done was merely preliminary to its main object and purpose. It had leased Brown's wharf, but this entailed but little financial responsibility and the expenditure of practically no capital at all. It had bought a lot at York Street, but had paid for it with mortgages on the lot, and the lot was presumably worth the mortgages. It went along in this preliminary way from July 1, 1906, to the 10th day of June, 1907, when the subscription of appellee was taken. After July 1, 1906, under its lease with the Western Maryland, it did a small business as warehouseman at Brown's wharf. The taking of the lease did not impose any financial hardship upon the company. The company was put in debt by the building. The giving of the mortgage did not embarrass the company; it was the beginning of the building, in July, 1907, that was the cause of the failure of the storage company.

When, therefore, Mr. Brady went to appellee, June 10, 1907, to get his $30,000 subscription, there was nothing in the kind or nature of the company or in the character of its business or its business situation which in any way whatever deprived appellee of the benefit of the rule, that his subscription was based upon the implied condition that he was not to be liable at all, unless all the capital stock was subscribed. On the contrary, every condition and reason was present in the situation to entitle him to .the benefit of this

rule. The company had merely perfected a preliminary organization, but not a full organization. It had for some months been doing a small business preliminary to the main business it intended to do, but had not commenced the main business. It now desired its capital stock subscribed in large amounts to fully organize the company and proceed with its main business. It was about to involve its stockholders in large financial obligations. It was the same as though the company was about to newly organize for its main and most expensive purposes. If, therefore, there ever was a time or a situation which entitled a subscribing stockholder to the benefit of the rule of this implied condition it was this time and this situation.

We, therefore, submit that there is nothing in the contention that this corporation at the time it procured appellee's subscription was not the kind of corporation, or was not doing the kind of business, or was not in the sort of situation which would entitle a stockholder to the benefit of the rule; but that, on the contrary, under the circumstances of this case, every ground and reason allowed by the authorities in Maryland and elsewhere for the application of the rule to appellee's subscription, were present and entitled him to it.

But it will be contended further by appellants that this company was chartered by certificate in November, 1904, and later on effected a preliminary organization, and had a president and officers, and that appellee's subscription not being made at the time of the preliminary organization, but subsequent thereto, is not entitled to the benefit of the rule. The Maryland authorities are a full answer to this contention. In *Morrison's Case,* 48 Md., this Court, speaking of the rule of the condition of subscriptions, says: "And this well-settled rule applies to subscriptions before and after the company is chartered." See also 2 *Clark & Marshall, Corp.* sec. 382, page 1177; sec. 439, etc., page 1365.

In *Musgrave's Case,* 54 Md., the rule was applied in favor of a subscriber to stock, notwithstanding the company organized in April, 1869, and continued in the prosecution of its

business for which it was chartered from that time continu-
ously down to May, 1871, when Musgrave became a stock-
holder. Notwithstanding the doubt JUDGE ROBINSON had in
that case, whether the rule would apply to a building associa-
tion, he seems to have had no doubt about the application of
the rule to Musgrave's subscription, notwithstanding he did
not become a subscriber until more than two years after the
company had organized and during which it had been doing
business. He expressly allowed him the benefit of the rule
of the condition of the subscription, but defeated him on the
ground of acts of estoppel, which amounted to a waiver of the
condition. See *S. & K. R. Co.* v. *Cushing,* 45 Me. 524; *Mun-
roe* v. *Ry. Co.,* 28 Mich. 275.

In *Temple* v. *Lemon,* 112 Ill. 55, the subsciptions sued on
were taken after the company had formed, and after it had
done business, and yet the rule was allowed. The reason of
all this is well illustrated in the case of *Anvill Mining Co.*
v. *Sherman,* 74 Wis. 228, where the rule was allowed in favor
of an after-subscribing stockholder, because, as the Court
there said, before the company can embark upon its *main*
enterprise, incurring the *main* expense, all its stock must be
subscribed.

There is nothing, therefore, in the *time* of his subscription
which will deprive appellee of the benefit of the rule.

But it will be contended further that the manner in which
he subscribed for this stock or the circumstances under which
he subscribed, deprive his subscription of the benefit of the
rule. It will be said that when he subscribed he knew that
the company had organized, even though the organization was
but a temporary or preliminary one; that it was doing some
little business; that it had rented a warehouse from the West-
ern Maryland Railroad Company, and in the lease had prom-
ised to build a warehouse, and that it contemplated spending
a large sum of money to build a warehouse of its own, and
that one who subscribes under these circumstances and with
this knowledge cannot have the benefit of the rule which
makes his subscription a conditional one. But why not?'

What is there in all this which places appellee in a different
position from that usually occupied by every man who takes
stock in an enterprise of this kind? Whoever subscribed for
stock in any concern without the knowledge that the com-
pany was about to embark in some business which would
require the expenditure of money? The very fact that he was
asked to subscribe for stock would inform him that the com-
pany needed money to invest in some enterprise. Every man
who subscribes for stock, whether at the time of the first
organization or later, if he is a business man at all, endeavors
to thoroughly inform himself before he subscribes as to the
object of the company, what business it proposes to embark in,
what money it proposes to spend, what it has in the way of
property, what it is doing in the way of business and what
it proposes to do. It is common knowledge that no business
man subscribes to stock without knowing all these things, or
at least trying to know them as far as he can. When was it
ever heard before that this knowledge on the part of the in-
tending subscriber would deprive him of the benefit of the
rule or the condition of his subscription?

As we have said above, the very fact that appellee knew
the company contemplated a new departure and was about
to build an expensive building and change from the condition
of a concern doing a little business, which required little or no
capital, and involved it in but little liability, entitled the
appellee peculiarly to the benefit of the rule. A subscriber
may know that a coal company has leased coal lands, or has
bought coal lands, and wants to pay for them and wants to
spend large money in improving the same, and yet it would
be idle to say that this very knowledge on his part, that the
company was about to spend large moneys in the enterprise,
would deprive him of the benefit of the rule, that he was not
to be bound unless the whole capital stock is subscribed. On
the contrary, it is just in such a case as that that the rule
applies with peculiar force. That is the very time and the
very occasion when a man will not embark his money without
some guarantee in the law that others to the full amount of

the capital stock will share the burden with him, and that the company will not and cannot, merely because he has subscribed a certain amount, throw the whole burden of the enterprise upon him. It is too clear for argument, therefore, that there is nothing in the manner of appellee's subscription, or in the circumstances under which he subscribed, which will deprive him of the benefit of the rule which inheres as a matter of law in his contract of subscription.

The implied right to the condition of the subscription is a valuable right, which belonged to the appellee the moment he signed for the stock. It was a right which arose out of the contract of subscription and because of the contract. It did not exist before the subscription. It could, therefore, only be waived by some act done at the time of the subscription or thereafter. Therefore, acts done before the subscription could not waive a right which arose out of the subscription, and which did not accrue until the subscription had been signed. And so it was held in *Curry Hotel Company* v. *Mullin*, 93 Mich. 319, that no acts done by the stockholders before the subscription could constitute a waiver of this right which grew out of the subscription. This is sufficiently obvious, and narrows the case down to the consideration alone of those acts of the appellee which were done at the time of the subscription or thereafter.

It is said that at the time the defendant subscribed and shortly thereafter he consented to be elected a director of the storage company, and that shortly thereafter he was elected a director and notified of his election, and that thereafter he was several times requested and urged to attend a meeting of directors, but always failed or neglected to do so. Now, what is there in all this which would estop appellee in his defense or amount to a waiver of his right? Estoppels of this kind are based upon conduct inconsistent with his present claim of right. At the time he consented, what was inconsistent in his consent to be elected a director?

He had subscribed for $30,000 of stock in the company, based upon a legal condition precedent that all the remainder

of the capital stock should be taken before he was bound. He naturally expected the company to go ahead and complete its organization according to this condition. Relying upon this, as he had a right to rely, was there anything inconsistent with his right to permit himself to be elected a director in a company which he had every right to suppose would in its further conduct proceed according to law? Becoming a director was perfectly consistent with all this. The estoppel is based upon inconsistent conduct, but there is nothing inconsistent here. His becoming a director was perfectly consistent all the time with his right to claim the condition of his subscription.

But it is said further that Mr. Timanus testified that he told him that the storage company was proceeding with its building. At what time he told appellee this does not certainly appear, but it was some time in the summer of 1907. It is not shown, however, that on these occasions he did anything or said anything, and there is not a particle of testimony in the record tending to show that appellee during this time knew or had any reason to suppose that the storage company was going ahead or getting itself in debt without getting its stock subscribed. It is said appellee did not object to the company's going ahead with the building. But why should he object? What right did he have to object? He had a right to presume that the company had financed its stock. His failure to object, therefore, was in no way inconsistent with his right to have all the stock subscribed. He never acted as a director or attended any of the meetings, either as director or stockholder. From beginning to end he took no part in the proceedings or conduct of the company. It is not shown that he had been informed by the company that it had let a large and expensive contract and had gone heavily in debt. So far as the record discloses, the first information appellee had is the letter of Mr. Henderson, August 26, 1907, calling on appellee for an installment of stock subscription, because "funds are needed for the completion of building now under construction at Dodson's wharf."

Appellee replies to this, August 30, 1907, that when he signed his subscription it was with the understanding with Mr. Brady that he would not be called upon for any payment until financial conditions became easier. Then follows the testimony of Mr. Timanus, that in pursuance of the action of the directors, September 24, 1907, he called on appellee and told him the company was in difficulties and asked for a payment on his subscription. Here, then, on or about September 24th, was the first time appellee was informed that the company needed money for its contractors. In the meantime, from July 1st, the company had gone ahead without obtaining any further subscriptions to its stock to amount to anything, after appellee subscribed, and had let a building contract for more than $136,000. It had not in any way complied with the condition of appellee's subscription. It had gotten itself head over heels in debt, and all this had been done without the knowledge of appellee down to September 24th, when he was called upon by Mr. Timanus for money and informed of the difficulties of the company. During all this time he had a right to presume that the company was keeping its contract with him, including the condition of his subscription. During all this time there is not one act shown on the part of appellee inconsistent with his defense to this action.

But it is said that some time in September, Mr. Brady called on appellee for a part of his subscription, and that appellee said he would try to arrange for some part of it, and that under the business conditions and money conditions, "he thought we had better hold off in the work at that time," and that in the latter part of September or early in October, Brady, Timanus and appellee, at the request of Timanus, went down to look at the building. They went all over the building and looked at it, and that appellee said he thought "we did very well, and the building was a very good one." That "we had made good progress, and it looked like a good building;" and that Mr. Timanus asked him for $5,000 on his subscription, and that appellee said he was going to New

York, and would try to raise some money for his payment to the storage company. And this testimony is relied upon as showing an estoppel upon the appellee.

But what was inconsistent in all this with the condition of his subscription? It was no act on his part as a member of the company, either as director or stockholder, which contributed in the slightest particular to bringing about the predicament in which the storage company then found itself. He had done no act which either directly or impliedly authorized the making of the debt, or which had encouraged the company in making the debt. Brady and Timanus say he made some indefinite promise about paying part of his subscription, but he did not pay. Even at that time the damage had been done, the debt had been created, the embarrassment existed, the company was insolvent. As soon as he heard of it he advised Brady to stop the work. In his letter to Messrs. Gibson and Smith, October 30, 1907, appellee says that at the time of his subscription he had advised Brady it was not wise to undertake any construction until conditions had improved, and criticises the policy of the company in undertaking the building without sufficient capital, and because of the hard times. Instead of doing any act encouraging the company toward incurring this disaster, this letter to Gibson and Smith, and the testimony of Mr. Brady show the attitude of appellee was one of cautious protest against incurring liability before the company was properly financed. He spoke of the building as a good one, but there is nothing in this to indicate that he thereby approved the policy of the company in bankrupting itself to build it. He merely gave expression to an obvious fact to the effect that the building had been well constructed. This was no doubt true, but cannot be construed by any stretch of the imagination into an approval of the policy which had procured the fine building at the expense of the solvency of the company, and even if he had paid a part of his subscription instead of making some indefinite promises in regard thereto, such payment *at that time* would

not have been inconsistent with his right to refuse to pay any further calls.

These, then, are the acts and all the acts relied upon by appellants to estop the appellee from setting up his defense of partial subscription. To these acts occurring after the subscription may be added all the other evidence in the record (if deemed admissible), showing the state of the knowledge of appellee of the situation and affairs of the storage company at the time he made the subscription, and all of it combined falls far short of that which will estop the appellee under the rule of waiver or estoppel in such cases laid down in this State and elsewhere. *Garling's Case,* 41 Md. 305; *Stillman's Case,* 44 Md. 380; *Gettysburg Bank Case,* 95 Md. 367; *Central R. Co.* v. *Johnson,* 30 N. H. 408; *Ridgfield R. Co.* v. *Reynolds,* 46 Conn. 375; *Parker* v. *Thomas,* 19 Ind. 220; *Salem Mill Dam* v. *Rope,* 9 Pick. 194; *Munroe* v. *F. W. R. Co.,* 28 Mich. 275.

PEARCE, J., delivered the opinion of the Court.

This action was brought in the Circuit Court for Baltimore County by John H. Morgan and Frank B. Smith, receivers of the Maryland Storage Company, a corporation under the laws of Maryland, duly adjudged to be insolvent, against Fairfax S. Landstreet, to recover the sum of $30,000, being the amount of the defendant's written subscription made June 10, 1907, for 600 shares of the capital stock of said company of the par value of $50 per share. The proceeding was by way of attachment against the defendant as a non-resident, who entered a voluntary appearance in the summons case. The short note contained one count for money due on account stated, and a special count on the contract of subscription. The defendant filed the two general issue pleas in assumpsit, and a third plea, "that the subscription mentioned in the plaintiffs' declaration was subject to a condition precedent, that said subscription was not to be binding on the defendant until all of the original capital stock of the said Maryland Storage Company was duly subscribed, and that

subscriptions were never obtained for all of said original
stock, and said condition precedent never complied with,
whereby the defendant's subscription never became effective
or binding." The plaintiffs joined issue on the defendant's
first and second pleas, and to the third plea filed two replica-
tions—first, that said subscription was not subject to the con-
dition precedent pleaded; and, second, that the defendant, by
his acts, had waived any and all defense on account of the
alleged fact that all of the original capital stock of the Mary-
land Storage Company was not subscribed.

The defendant joined issue on the first replication to the
third plea, and as to the second replication, rejoined that he
had not, by his acts, waived any defense on account of the
alleged fact that all of the said original stock had not been
subscribed. And the plaintiffs joined issue by way of surre-
joinder on the defendant's rejoinder to the plaintiffs' second
replication to the defendant's third plea. It thus appears
that the fact of the subscription was admitted, and also that
no part of the same has been paid, and under the pleadings
two questions only were in issue—first, whether the contract
of subscription was subject to the condition precedent plead-
ed; and, second, if so, whether such condition had been waived
by the acts of the defendant.

At the close of all the testimony on both sides of the case,
the defendant moved to strike out certain items of testimony
which had been admitted subject to exception, and the plain-
tiffs moved to strike all the testimony adduced at the trial
which tends to qualify the written subscription, whether con-
tained in the defendant's own statements or in his letters of-
fered in evidence, or in the testimony of the witnesses Tima-
nus and Brady; also defendant's statement of what he told
Timanus as to taking the last $30,000 of stock, when he,
Timanus, had secured the balance, and also what he said
either to Redwood or Brady, as to any subscription to be made
to this stock by the Western Maryland Railroad Company.
Both these requests were refused.

The plaintiffs then offered five prayers, all of which were

rejected, and the defendant offered three prays, of which the second and third were rejected, and the first was granted, as follows: "The Court instructs the jury that by the uncontradicted evidence in the case the stock of the Maryland Storage Company authorized by its charter was never fully subscribed, and their verdict must be for the defendant, there being no evidence in the case legally sufficient to estop the defendant from setting up the defense of partial subscription to stock," thus withdrawing the case from the jury. The rejected prayers will be set out by the Rejorter. The defendant excepted specially to the plaintiffs' second prayer on the ground that there was no evidence that defendant subscribed to any increased capital stock of the storage company, and not its formative or original stock, and this special exception was sustained; all of these rulings being embraced in the single exception taken.

A brief statement of the history of the case will throw material light upon the situation, before going into the law appplicable to the case.

The storage company was incorporated under the laws of Maryland, Nov. 18th, 1904, to carry on a forwarding and warehouse business, there being seven directors, and the authorized stock being 3,000 shares of the par value of $50 each. Mr. Timanus was then President of the storage company, and Mr. Landstreet was then Vice-President of the Western Md. R. R. Co. This company had recently established a tidewater terminus at Port Covington, and one of the principal objects of the organization of the storage company was to secure the storage business incidental to the new tidewater terminus. This appears in Mr. Timanus' letter of July 1st, 1904, to Mr. Landstreet as Vice-President of the railroad company. On November 17th, 1904, Timanus, learning that the railroad company was about to acquire the possession of Brown's wharf, on the north side of the harbor of Baltimore City, proposed to Landstreet to take a lease of the warehouse then on that wharf. This permitted, without further cost for building, a small active business, requiring nine or

ten clerks and laborers and doing a business of about $1,800 a month. He testified they were trying to get the railroad company or Landstreet interested in the storage company. No agreement was reached in the matter of the lease until June 12, 1906, when a lease of Brown's wharf was executed for five years, containing a covenant on the part of the storage company to erect a storage house on York Street, to be completed, if possible, by January 1st, 1907. At that time there was no actual subscription by Landstreet, either for the railroad company, in his own name, or for any other individual. In May, 1905, the charter was duly amended, so as to increase the number of directors from seven to nine. In July, 1906, a stockholders' meeting was called for the purpose of increasing the capital stock from $150,000 to $250,-000 and the number of directors from nine to twelve. It appears from the minutes of that meeting that stockholders were present representing sixty-five shares of stock, that being more than two-thirds of the whole number of shares then issued, and that these voted to increase the amount of capital stock and the number of directors as above proposed. These proceedings, however, were abortive, both because the requisits notice was not properly addresed to the stockholders, and because the proposed amendment was not acknowledged and recorded as required by secs. 51, 52 and 55 of Art. 23 of the Code.

In May, 1907, Landstreet resigned as Vice-President of the railroad company, and Brady, Vice-President of the storage company, testifies that at that time he asked him when he would sign a subscription, as some who had subscribed would not pay until they felt sure of his subscription, as he had resigned from the railroad company, and he said he would let him hear in a few days. Later he told Landstreet they wanted him as a director. On June 10, 1907, he signed the subscription and consented to be elected a director. At that time there were ten directors elected and serving, being one more than the charter allowed. Landstreet never quali-

fied as director, and never attended any stockholders' or directors' meeting.

At the date of his subscription, Brady testifies there were subscriptions, including Landstreet's, of about $101,000, and no greater amount was ever subscribed.

Mr. Morgan, one of the receivers, testified from the books and papers that came into his hands as receiver, that at that time $40,000 had been paid in on subscriptions, about $36,-000 unconditional subscriptions, unpaid, including Landstreet's $30,000, and some conditional subscriptions, unpaid, the whole amounting to about $101,000, as stated by Brady.

On July 1, 1907, there being then only $76,000 unconditionally subscribed, including the $30,000 of Landstreet, the directors resolved to build the York Street storage house at a cost not to exceed $145,000. The York Street lot was subject to two mortgages aggregating $51,000, and the building contract called for an expenditure of $136,000. The lot sold for barely enough to cover these mortgages. Brady in the latter part of July, 1907, tried to induce Landstreet to go to see the building, then started, but he declined to go. In September, 1907, he asked Landstreet for a payment on the subscription, and he told Brady that, under the business and financial conditions existing they ought to hold off the work, and Brady explained they had gone too far to stop. Later, and early in October, Landstreet did go with Timanus and Brady and examine the work in progress, and he said he thought it was a good building. Brady did not then ask for any payment and did not hear Timanus ask for any; and Brady never afterwards saw him on that subject.

Timanus testified that he asked Landstreet several times in the summer and fall of 1907 for payments on account, and his answer was that money was hard to get, and once, in September, 1907, he said he was not liable and would not pay it at all.

He also testified that Landstreet told him that when he subscribed Brady told him that all the stock had been either subscribed or promised. Brady, however, denied this, and

said, that he told Landstreet that his binding subscription would enable them to get many others, but did not say they could complete the total authorized capital. Landstreet testified that when the organization of the storage company was under discussion between Timanus and himself, he said that if he woud get a strong management and have the finances in unquestionable form before undertaking the enterprise, the railroad company would co-operate with him and would take *the last* $30,000 of its stock of $150,000, and that in all the negotiations throughout he acted in behalf of the railroad company, and at no time and in no way as an individual, and that it was so understood by all concerned. He states that as early as January, 1907, when informed by Brady of their plan to acquire property on the south side of the harbor that he advised against any additional enterprises, and that after his resignation as Vice-President of the railroad company he remained one of its directors, and told both Timanus and Brady they would have to take up the subscription of the railroad company with other officials and that if the storage company complied with the previous understanding, he saw no reason why the matter should not be concluded. That shortly after this Brady came to see him, and said that he had responsible men in Baltimore, mentioning a number of them, who were only waiting for the signature of the railroad company, and who would then sign subscriptions to the full amount of the authorized capital stock of the company, and urged him to sign personally for this $30,000, which he did upon those assurances, and the further assurance that their finances were in condition to meet any undertaking entered into.

He also says, that in signing he expressly stated to Brady that he was not signing his name as an individual that would engage him in any financial obligation, and that Brady replied nothing was to be paid on that subscription until business conditions would warrant it. He also says that when he visited the building in October, 1907, no reference was made to his subscription, but Messrs. Timanus and

Brady stated that they wished to arrange with the Western Md. R. R. Co. to take over this building, and some of the officials advised them to get him to examine it, so that he could report thereon to the executive board.

We have thus condensed the most material testimony in the case, and will now consider the propriety of the granted instruction, which constitutes the principal and controlling question in this appeal.

We could not expect, and do not understand the appellants to deny the general rule, that where the capital stock and the number of shares are fixed by the act, or certificate, of incorporation as in the present case, no assessment can be lawfully made on the share of any subscriber until the whole number of shares has been taken. This principle was early adopted both in England and in this country, and is now firmly established as a rule of law. Two of the earliest cases in this country are *Salem Mill Dam* v. *Ropes,* 6 Pick. 23, and *Stoneham* v. *Gould,* 2 Gray, 277, in both of which the reasons for the rule were given by eminent Chief Judges of the Supreme Court of Massachusetts, PARKER and SHAW. No more convincing reasons could be given than those stated by CHIEF JUDGE SHAW in 2 *Gray, supra.* He says: "This is no arbitrary rule. It is founded on the plain dictate of justice and the strict principles regulating the obligation of contract. When a man subscribes for a share of stock, consisting of one thousand shares, in order to carry on some designated enterprise, he binds himself to pay one-thousandth part of the cost of such enterprise. If only five hundred are subscribed for, *and he can have no assurance which he is bound to accept,* that the remainder will be taken, he would be held, if liable to an assessment, to pay one-five hundredth part of the enterprise, besides incurring the risk of the entire failure of the enterprise itself, and the loss of the amount advanced towards it."

This rule, with the reasons which led to it, were adopted in this State in *Hughes* v. *Antietam,* 34 Md. 331, and has been laid down consistently since in *Cleveland* v. *Hager,* 36

Md. 476; *Garling* v. *Baechtel,* 41 Md. 305; *Dougherty* v. *Gilman,* 44 Md. 380; *Morrison* v. *Dorsey,* 48 Md. 472; *Musgrave* v. *Morrison,* 54 Md. 164, and *Gettysburg Bank* v. *Brown,* 95 Md. 367. In the last-mentioned, the latest case upon the point in this State, JUDGE PAGE said: "These rules apply to subscriptions made before and *after* the company is chartered. They are founded upon the theory that the subscription is made upon the implied understanding that the entire amount of stock fixed by the charter is necessary for the successful prosecution of the business for which the company was incorporated. It is not to be supposed that a reasonably prudent person will invest in a corporation which is not to be supplied with sufficient capital with which to prosecute its affairs; and therefore it is that a presumption arises that the amount fixed in the charter shall be raised before the corporation creates any liabilities."

There are substantial differences, it is true, in this regard between "original or formative" stock and "increased" stock, but that question does not arise here, because the attempt to increase the stock was not operative.

It is sufficient that the Maryland rule is as stated, but, as indicating its soundness and universality, it may be stated that it prevails in New York, Missouri, Connecticut, New Hampshire, Wisconsin, Iowa, Georgia, California, Illinois, Maine, Tennessee, Ohio and generally throughout the United States.

It will be observed that it is spoken of generally as an implied rule, but it may of course be expressed, and in this case the uncontradicted testimony of Mr. Landstreet is that he expressly agreed to take only *the last $30,000 of the whole amount of $150,000,* so that his subscription was upon the express condition that the whole residue of the stock should be taken before his subscription became binding. This condition not having been incorporated in the written subscription, might, perhaps, not have been available as a defense, if the residue had been fully and unconditionally subscribed; but the uncontradicted evidence in this case shows that there

were never over $76,000 unconditional subscriptions, and the cases are uniform that for this purpose there can be counted only unconditional subscriptions, payable in cash. *Troy* v. *R. R. Co.*, 8 Gray, 596; *Oscaloosa* v. *Parkhurst*, 54 Iowa, 357; *Brand* v. *Lawrenceville R. R.*, 77 Geo. 506; *Cal. Southern Hotel Co.* v. *Russell*, 83 Cal. 277.

While the appellants, as we have said, do not deny the general rule invoked, they do contend that "if the corporation is already a going concern at the time of the subscription, and is continuing to create liabilities to the knowledge of the subscriber, and the subscriber also knows that its stock fixed in its charter is not fully subscribed," then the presumption which this Court, in *Gettysburg Bank* v. *Brown*, 95 Md. 386, said arises, "that the amount fixed in the charter shall be raised before the corporation creates liabilities," cannot arise, and the rule has no application. This contention seems to us to confound the general rule with the subsidiary rule, equally well settled, that this defense may be waived, or the subscriber be estopped from setting it up. The appellants cite in support of their contention what they concede to be a dictum of this Court in *Musgrove* v. *Morrison*, 54 Md. 161, in which Judge Robinson said: "We do not mean to say that this rule applies to corporations of every kind without regard to the objects and purposes for which they are chartered. * * *. In this case, the company was chartered for the purpose of buying, selling and leasing property and also as a homestead and building association, and at the time of the appellant's subscription was engaged in the prosecution of its business, and *he knew at the same time that its whole capital stock had not been taken,* and under these circumstances it might well be argued that his subscription was not made upon the condition that the company was not to organize until the whole number of shares had been taken." But the learned Judge, nevertheless, placed the decision squarely on the ground that during three years that he was a member, he not only regularly paid his weekly dues, but accepted his proportion of the profits earned, and through an attorney

voted his stock at all meetings, whether for the election of directors or the transaction of other business, and the Court expressly states that all this time he knew the whole capital stock had not been taken.

Another case cited for their contention is *Arkadelphia Mills* v. *Trimble*, 54 Ark. 519, in which the Court said: "The fact was that the corporation began business as soon as the $14,500 was subscribed, and after that Trimble agreed to take and pay for the $500 subscribed by him. From this it is evident that there was and could be no implied condition in his agreement that the corporation should not begin business until all the capital stock was taken. The corporation was engaged in business when he subscribed. It was evident it would need money in the prosecution of its enterprise, for if it would not, there was no necessity for his subscription. He was not to be an honorary member." A little further examination of that case will show, however, that far from supporting the appellants' contention as applied to the facts of this case, it bears out the application of the general rule as inherent in the appellee's subscription, and shows it as avoidable only by waiver or estoppel. The articles of association in that case which were subscribed by Trimble contained the following provision: "The amount of capital stock of said association shall be $50,000, of which $14,500 have been subscribed by corporators aforesaid, *and the residue may be issued and disposed of as the board of directors may from time to time order and direct;*" and the Court said: "No implication arises from this provision that the corporation was to postpone its enterprise until all the capital stock had been subscribed. The most reasonable inference to be drawn from it is that the $14,500 was all the money needed for the purpose. The fact was that it began business as soon as the $14,-500 was subscribed, and after that Trimble agreed to take his stock." These articles of association could well be construed as fixing the formative or original stock at $14,500, with power to increase the same from time to time as the directors should see fit, up to $50,000, and this is precisely

what it is fair to presume JUDGE ROBINSON meant in *Musgrave* v. *Morrison, supra,* when he said, on page 164: "It may be obvious from the face of the charter itself, that the whole capital stock is not in any manner necessary to the organization of the company, and that the subscriber knew, or had reason to know, this at the time of subscription."

We can perceive nothing in the case before us in the nature or kind of business for which the storage company was incorporated (if that can in any case be a proper subject of inquiry), nor in the time when, or the circumstances under which, the appellee made the subscription in suit which should take this case out of the general rule. It appears from the subscription blank that the capital stock was then designed to be $250,000, presumably upon the supposition that the attempted increase from $150,000, as fixed by the certificate, to $250,000 was regular and effective. The original stock, however, was $150,000, and there is no evidence, as in the Arkansas case, *supra,* that the charter authorized the organization of its main enterprise before the full amount was subscribed. The subscription in this case was made June 10, 1907. Prior to June 12th, 1906, the company was doing a small business, principally in towing and lighterage, requiring comparatively small capital. In July, 1906, it leased Brown's wharf and began a storage business there, but at that time it contemplated the expenditure of a large amount in the erection of a modern storage warehouse, to which it bound itself in that lease in pursuance of negotiations with the appellee representing the railroad company. The erection of that warehouse, for that purpose, then became and continued to be its main enterprise. The appellee's subscription was made June 10, 1907, and the building contract, made in July, 1907, called for an expenditure of $136,000, nearly the whole of the authorized capital. In addition to this, the storage company purchased ground on which to erect the warehouse, and mortgaged the same for $50,000. All this was done without the concurrence of the appellee, who at the time of making the subscription advised against undertaking any construction un-

der existing business conditions, and continued so to advise. In considering this situation it must not be forgotten, as said in *Hager* v. *Cleveland,* 36 Md. 487, that "there is a wide difference between the *existence* of the company as a corporate body, and the liability of parties for their subscriptions to its capital stock;" and, as repeated in *Gettysburg Bank* v. *Brown,* 95 Md. 385, that "this rule applies to subscriptions made before and *after* the company is chartered." The fact that the appellee knew that the storage company was about to involve its stockholders in this large financial undertaking is conclusive that he was entitled to the benefit of the rule he now invokes. We cannot imagine a situation in which this rule could apply with more peculiar force if the reasons so forcibly assigned by JUDGE SHAW in 2 *Gray, supra,* and so fully approved by this and other Courts, are in themselves sound and satisfactory.

But it remains to enquire whether this defense has been waived, or the appellee estopped to claim its benefit.

In considering this question it must be kept in mind that there is not only no evidence to show that Landstreet did not know all the stock was not subscribed, but that he subscribed in reliance upon Brady's assurance that it was all either actually subscribed or promised to be subscribed immediately upon his subscription being made, as indicating the co-operation of the railroad company. Technical estoppel, it may be conceded, is not required, and any acts which constitute waiver will be sufficient.

It is uncontradicted that Landstreet never qualified as a director, and never attended any directors' or stockholders' meeting, nor participated in any way in the incurring of any obligation or the transaction of any business of the company.

In *Garling* v. *Baechtel,* 41 Md. 305, it was held that where a stockholder attends meetings of the company, *knowing the whole capital stock has not been taken,* and votes for the expenditure of money for the purchase of property and materials to carry on the business of the company, he will not be

permitted to set up the defense that the capital stock had not all been taken. And to the same effect is *Hager* v. *Cleveland,* 36 Md. 476; *Stillman* v. *Dougherty,* 44 Md. 380. But in *Garling* v. *Baechtel,* 41 Md., *supra,* which was a suit to recover of Garling as a stockholder a debt due Baechtel by the company, JUDGE ROBINSON also said: "The mere fact that he paid his subscription, knowing that the whole capital stock had not been paid in, and that the company was incurring debts for property and material, were not such acts of participation as to estop him from setting up in this action the partial subscription of the capital stock." And this was held also in *Bray* v. *Farwell,* 81 N. Y. 600, in a similar case, where defendant never attended a stocholders' meeting or assented in any way to the commencement of the enterprise before all the shares, were taken.

In *Ridgefield R. R.* v. *Reynolds,* 46 Conn. 375, Reynolds attended stockholders' meeting to elect directors and was himself elected a director and accepted. He was present at a meeting of directors when an assessment of forty per cent. was laid, and when a report was made by the President of a contract for construction, and work actually begun; but it did not appear he participated in any *action taken* at the meeting. It was held none of these things constituted a waiver. CHIEF JUSTICE PARK said: "The case is silent as to his *conduct.* His simple *presence* is as much in accord with one supposition as the other. The burden of proof is on the appellees."

In *Masonic Temple* v. *Channell,* 43 Minn. 353, the Court said: "It is to be regretted that there has been any relaxation of this rule. The acts as stockholder which will constitute a waiver are those which constitute a part of the business for which the corporation is formed, and which evince a willingness to enter upon that business with the stock already subscribed." This is a clear and plain statement of the principle upon which all such questions should be resolved.

In that case the defendant was a director, attended meetings as such, and was chairman of a committee to select a

building site, and only resisted payment when the site he favored was not selected. This was held a waiver. The facts in this case do not, in our opinion, bring it within any well-considered decision under which a waiver could be found, and we think the learned Judge below correctly granted the defendant's first prayer.

As this necessarily requires the affirmance of the judgment, there is no occasion to consider the other prayers, nor the disposition of the motions to strike out evidence, all of which were refused.

> *Judgment affirmed with costs to the appellee above and below.*